[No. 6718–8–II.   Division Two.   October 18, 1984.]

OCOSTA SCHOOL DISTRICT NO. 172, *Respondent,* v. FRANK B. BROUILLET, *as Superintendent of Public Instruction, Appellant.*

786

*Kenneth O. Eikenberry, Attorney General,* and *Robert E. Patterson, Assistant,* for appellant.

*John S. Biggs,* for respondent.

WORSWICK, J.—The State Superintendent of Public Instruction appeals a writ of mandamus ordering him to pay Ocosta School District $115,469.97 as part of Ocosta's 1979–80 allocation of state basic education funds. Ocosta received an equivalent amount in September 1979 from Grays Harbor County as its share of proceeds of a timber sale from a county–owned tax title parcel. The Superintendent deducted the amount from Ocosta's annual state allocation under a statute which authorized him to deduct "[o]ne hundred percent of such other available revenues as the superintendent of public instruction may deem appropriate for consideration in computing state equalization support." Former RCW 28A.41.130(4) (Laws of 1973, 1st Ex. Sess., ch. 195, § 9, p. 1453).[1] The trial court found the

---

[1]The statute included four specific categories of deductions:

"(1) The receipts from the one percent tax on real estate transactions which may be imposed pursuant to chapter 28A.45 RCW: PROVIDED, That the funds otherwise distributable under this section to any school district in any county which does not impose a tax in the full amount authorized by chapter 28A.45

deduction invalid because the Superintendent had not specifically identified funds from such a source as deductible in a rule promulgated under the administrative procedure act (RCW 34.04) before the deduction was made. The Superintendent did promulgate such a rule, but after he had made the deduction.

The issues before us are whether the Superintendent was required to adopt a rule under the APA authorizing the specific deduction, and whether his adoption of such a rule came too late. We reverse, holding that an APA rule was required but that such a rule was adopted in time.

The essential facts are undisputed.[2] The Legislature appropriates and the Superintendent annually allocates funds to local school districts for basic education. The formula and the allocation process are complicated, but the purpose is to supplement other funds available to the districts so as to achieve approximate equality of funds available for the education of each student. *See generally* RCW 28A.41. RCW 28A.41.170 requires the Superintendent to adopt rules for administering this allocation.[3] Accordingly,

---

RCW shall be reduced by five percent; and

"(2) One hundred percent of the receipts from public utility district funds distributed to school districts pursuant to RCW 54.28.090; and

"(3) One hundred percent of the receipts from federal forest revenues distributed to school districts pursuant to RCW 36.33.110; and

"(4) One hundred percent of such other available revenues as the superintendent of public instruction may deem appropriate for consideration in computing state equalization support." Laws of 1973, 1st Ex. Sess., ch. 195, § 9, p. 1453.

Former RCW 28A.41.130(4) was amended by Laws of 1980, ch. 154, § 12, p. 496 which made federal forest funds nondeductible and made all other local funds deductible at the Superintendent's discretion.

[2]Ocosta has "objected" to some of the findings but has not cross–appealed and has not assigned error to them. They are verities on appeal. *United Nursing Homes, Inc. v. McNutt*, 35 Wn. App. 632, 669 P.2d 476 (1983).

[3]The pertinent part of RCW 28A.41.170(1) reads as follows:

"(1) The superintendent of public instruction shall have the power and duty to make such rules and regulations as are necessary for the proper administration of this chapter not inconsistent with the provisions thereof, and in addition to require such reports as may be necessary to carry out his duties under this chapter."

the Superintendent adopted a rule providing for annual bulletins to affected districts advising them of his specific intentions as to deductions to be made pursuant to RCW 28A.41.130.[4] Such bulletins were issued annually since at least 1975.

The Superintendent considers county administered forest funds to be deductible. He does not, however, consider revenues from the sale of tax title land deductible, because he views such revenues as representing the recovery of unpaid taxes. He considers county administered forest funds as windfalls, not allocated by law to any nonbasic education purpose and thus available for basic education funding. The annual bulletins adequately described the Superintendent's position. Ocosta had actual advance notice of this in the bulletin affecting the 1979–80 school year.

Shortly after disbursing the timber sale funds to Ocosta, the Grays Harbor County Treasurer wrote to the State Auditor's office asking whether the funds were properly classified as county forest funds or as revenues from the sale of tax title land. An auditor mistakenly replied that the funds were tax sale revenues, relying in part on a citation in *The Accounting Manual for Public School Districts of the State of Washington,* which is published by the Superintendent and which governs school district accounting procedures. RCW 28A.65.440; WAC 392–123–010. Soon after, however, a letter from the Superintendent's attorney

---

[4]The rule did not specifically state that the annual notices would be by "bulletin." However, bulletins were the Superintendent's customary method of fulfilling the directive in section two of the rule. Former WAC 392–121–035 provided:

Apportionment funds resources and computation data. (1) In addition to those funds appropriated by the legislature for apportionment purposes, the revenues identified in and/or pursuant to RCW 28A.41.130 shall be included in the total of those funds from which the amount of the per weighted student guarantee shall be derived.

(2) The superintendent of public instruction shall annually advise each school district of the revenues identified pursuant to subsection (1), together with estimates thereof. In addition, the superintendent shall establish, in cooperation with the department of revenue, the annual period(s) from which pertinent data relating to said revenues shall be derived. [Order 7–75, § 392–121–035, filed 12–22–75. Formerly WAC 392–29–180.]

informed Ocosta's attorney that the funds in question were county administered forest funds and therefore deductible.[5]

In March of 1980, representatives of Ocosta met with representatives of the Superintendent's office and opposed the deduction, arguing that the APA requires that particular deductions be identified in formally adopted rules. Nevertheless, the Superintendent deducted the funds from Ocosta's basic education allocation in June 1980. Later, on July 28, 1980, the Superintendent repealed WAC 392–121–035 and adopted WAC 392–121–175[6] which specifically identified proceeds from sale of timber on tax title property as deductible revenues. This rule was adopted according to APA procedures. On August 1, 1980, Ocosta filed this action for a declaratory judgment.

On August 28, 1980, the Superintendent adopted an emergency amendment[7] to WAC 392–121–175 the purpose

---

[5]Ocosta contends that the citation in the *Accounting Manual* relied on by the State Auditor controls the fund's deductibility because the *Accounting Manual* is clearly identified in WAC 392–123–010 while the bulletins were more ambiguously incorporated into WAC 392–121–035. This argument is not convincing. The trial court's undisputed findings and conclusions show that the Superintendent deemed the funds to be deductible county forest funds. Ocosta clearly knew of the decision through the bulletins and the Superintendent's letters. Ocosta was not actually confused by any ambiguities between the *Manual* and the bulletins.

[6]WAC 392–121–175 as originally filed provided as follows:

"Basic education allocation—Deductible revenues. In addition to those funds appropriated by the legislature for basic education allocation purposes, the deductible revenues expressly identified in RCW 28A.41.130 and the following deductible general fund revenues shall be included in the computation of the total annual basic education allocation of each school district pursuant to RCW 28A.41.130 and 28A.41.140:

"(1) Proceeds from the sale of tax title real property managed by a county or of property rights appurtenant thereto;

"(2) Proceeds from the sale, rental or lease of stone, minerals, timber, forest products, other crops and matter, and improvements from or on tax title real property managed by a county;

"(3) State forest funds;

"(4) Proceeds from the state timber excise tax reserve fund;

"(5) Federal in–lieu–of tax payment; and . . ."

[7]The emergency amendment added the following section:

"(6) County in–lieu–of tax payments: *Provided,* That otherwise deductible

of which was:

> to clarify during the 1979–80 school year what local revenues received during the year will and will not be considered, in calculating a district's state basic education allocation entitlement for the year . . .

This amendment became effective when filed with the Office of the Code Reviser on August 29, 1980. RCW 34.04-.040. Thereafter, it was readopted under nonemergency procedures and became effective as a permanent rule in October 1980.

The Superintendent contends that no formal APA rule identifying the deduction was necessary, and that the bulletins were sufficient. We disagree.

█ The Superintendent plainly constitutes an "agency" under state law (*see* RCW 28A.03) and is subject to the APA (*see* RCW 34.04.010(1)). He has both the authority and the duty to promulgate such rules as are necessary to carry out his duties. RCW 28A.41.170. RCW 34.04.010(2) defines "rule" as:

> [A]ny agency order, directive, or regulation of general applicability . . . (c) which establishes, alters, or revokes any qualification or requirement relating to the enjoyment of benefits or privileges conferred by law; . . . but does not include (i) statements concerning only the internal management of an agency and not affecting private rights or procedures available to the public, . . .[8]

---

revenues from any of the foregoing sources received by a school district during the 1979–80 school year and any school year thereafter due solely to the district's levy of a building fund or bond interest and redemption fund excess tax levy shall constitute nongeneral fund revenues and shall not be deducted in the computation of the district's annual basic education allocation for that school year."

The passage quoted in the text was taken from the declaration of emergency in Administrative Order 80–34, which authorized the amendment.

[8]The Superintendent's *contention that the deductions were internal matters*—subject to the "internal management" exception—is disposed of by unchallenged finding of fact 93:

> That intermediate school districts (now educational service districts) are political subdivisions, local school districts are municipal corporations and SPI is a state agency which exists as separate legal entities. Directives of SPI to such other entities are not internal directives within SPI.

It is self–evident that the allocation of state education funds is a "benefit . . . conferred by law."

■ Rules are invalid unless adopted in substantial compliance with the APA. RCW 34.04.025(5). Paramount among the requirements are notice and the opportunity to submit pertinent information (RCW 34.04.025(1)(a), (b)). The existence of—and required adherence to—these requirements is fundamental to the constitutional validity of legislative delegations to administrative agencies. *Barry & Barry, Inc. v. Department of Motor Vehicles,* 81 Wn.2d 155, 500 P.2d 540 (1972). The flaw in this case is not so much the failure to give notice; through the bulletins, Ocosta well knew of the Superintendent's intentions (*see Jensen v. Department of Ecology,* 102 Wn.2d 109, 685 P.2d 1068 (1984)). It lies in the Superintendent's failure to afford interested parties (Ocosta, for one) the opportunity to submit information before he made his rule. The bulletins told the districts what would be deducted. They did not ask for comment. Comment was especially necessary in this case because, as the trial court found, the Superintendent's "rule" was based on certain factual assumptions; *e.g.,* the revenue constituted "new money" to the districts and the deduction would not act as a "disincentive" to generate the revenue in the first place. The districts should have had a chance to dispute these assumptions. Also, the "rule" affected the districts' ability to budget, required by RCW 28A.65, and thus affected their ability to contract (RCW 28A.58.010) and to meet their liabilities for debts (RCW 28A.58.020). The districts should have had a chance to say something about this, too, and the Superintendent at least was required to listen. An APA rule was required; the bulletins did not suffice.

The Superintendent purported to cure the deficiency by

For the same reason, the Superintendent's heavy reliance on *Island Cy. Comm. on Assessment Ratios v. Department of Rev.,* 81 Wn.2d 193, 500 P.2d 756 (1972) is misplaced. A central holding of that case was that a challenged procedure of the Department of Revenue related only to internal management and therefore was not subject to the APA.

adopting WAC 392-121-175. The remaining question is whether, as Ocosta contends, the cure was too late. We hold it was not.

Although the new rule was adopted after the Superintendent had made the deduction, it was adopted before August 31, 1980, the end of the school year. RCW 28A.01-.020. The clarifying amendment was adopted in emergency form before the end of the school year and in permanent form before the end of the accounting period for that year. Ocosta contends that to allow the deduction under this rule would be improper because it would thus be deprived retroactively of funds to which it had a vested right. We disagree.

Considering the allocation scheme in light of the totality of the statutes and valid rules creating it, it is clear to us that there is no finality to an allocation until the close of the accounting period. Thus no rights vested—if indeed they ever did—until the close of the accounting period. The Superintendent only estimates the amount of State funding available to each district at the beginning of each year. He adjusts the estimates as data become available throughout the year and makes his final accounting in the January following the close of the school year. While he attempts to make payments throughout the year in such a way as to maintain an even cash flow to the districts, he does not calculate or fix the actual allocation at least until after the close of the school year. Indeed, it is impossible for him to do otherwise because he cannot know until at least late in the school year what deductible funds have come to the districts.

Ocosta knew all this and knew that the amount of State funds it was to receive could be changed before the accounting period ended. It was never misled as to the Superintendent's intentions. The only contention it ever made was that the Superintendent had not followed the letter of the law.

The Superintendent followed the letter of the law in adopting WAC 392-121-175 and its amendment. Ocosta

had the opportunity to comment both regarding the original adoption of the rule and the permanent readoption of the amendment, even though it had no such opportunity as to the emergency adoption. RCW 34.04.030. Considering the discretion vested in the Superintendent in this arcane field of school finance (*see Island Cy. Comm. on Assessment Ratios v. Department of Rev.*, 81 Wn.2d 193, 500 P.2d 756 (1972)), coupled with Ocosta's knowledge and its inability to expect the fixing of a final allocation until the end of the accounting period, we hold that the Superintendent's delayed but valid rule was sufficiently timely to support the deduction.

Reversed.

PETRICH, C.J., and PETRIE, J., concur.

Review denied by Supreme Court December 19, 1984.