[No. 61105-0.   En Banc.   December 15, 1994.]

FAILOR'S PHARMACY, *Respondent*, v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Petitioner*.

J&M SERVICE CO., INC., *Respondent*, v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Petitioner*.

SAV-ON DRUGS, INC., *Respondent*, v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Petitioner*.

*Christine O. Gregoire, Attorney General,* and *Mary Jo Diaz, Assistant,* for petitioner.

*Inslee, Best, Doezie & Ryder, P.S.,* by *Thomas H. Grimm; Law Offices of Everett Holum,* by *Everett Holum,* for respondents.

DOLLIVER, J. — Defendant Department of Social and Health Services (DSHS) seeks a reversal of a superior court decision granting partial summary judgment to Plaintiffs Failor's Pharmacy, J&M Service Company, Inc., and Sav-On Drugs, Inc., and denying Defendant's cross motion for dismissal. Defendant challenges the Superior Court's holding that DSHS changes to Medicaid reimbursement payment schedules for prescription drugs must be adopted by rulemaking pursuant to the former administrative procedure act and that the payment schedules in this case are consequently invalid. We affirm.

Defendant is the state agency charged with administration of the State's Medicaid program. RCW 74.09. The Federal Medicaid program allows states to receive federal assistance for the provision of medical care to eligible needy persons. *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 502, 110 L. Ed. 2d 455, 110 S. Ct. 2510 (1990). A participating state has flexibility to administer its program within the confines of the Federal Medicaid act and federal regulation. *Wilder,* 496 U.S. at 502. In Washington, state law allows DSHS to purchase Medicaid services by contract or at rates established by the Department. RCW 74.09.120. Within this delegation DSHS has managed participation in the Medicaid program by requiring providers to apply for a provider number, sign a core provider agreement (Agreement), and abide by all applicable state and federal licensure requirements. WAC 388-87-007. The Agreements permit a provider to withdraw by written notice from the program at any time without penalty. Plaintiffs became Medicaid providers of prescription services under Agreements signed by Failor's Pharmacy in 1970, by Sav-On in 1972, and by J&M, Inc., in 1982.

The terms of reimbursement for prescription services are incorporated into the Agreements by reference:

Reimbursement for covered services will be made according to the Schedule of Maximum Allowances, the drug formulary and other applicable payment levels or schedules. This must be accepted as sole and complete remuneration for services covered under the program.

Clerk's Papers, at 23; WAC 388-91-035. Title XIX (of the Social Security Act, 42 U.S.C. § 1396 *et seq.*) program regulations require all State Medicaid agencies to reimburse providers for prescriptions on the basis of two factors: (1) actual or estimated cost for pharmacies to acquire drug ingredients, and (2) a dispensing fee. 42 C.F.R. § 447.331. Following the federal mandates, state regulation establishes DSHS methodology for determining pharmacy reimbursement:

The department will not pay more than the lower of ingredient cost plus a dispensing fee or the provider's usual and customary charge to the public. Ingredient cost will be set at the estimated acquisition cost, which is the department's best estimate of the price providers generally are paying for a drug. The dispensing fee will be set by taking into account the results of surveys and the costs of pharmacy operation. Reimbursement may also be made through exclusive service contracts for the provision of prescription drugs for nursing home patients.

WAC 388-91-040(4).

Under federal law prior to 1987, states might establish the dispensing fee by considering periodic cost surveys including operational, professional services, overhead, and profit data and might vary fees according to various factors, including pharmacy size and location. Former 42 C.F.R. § 447.333(a), (b) (1983). DSHS conducted surveys of all pharmacies in the Medicaid program in 1976 and 1978. In 1979, DSHS then introduced a new 2-tiered reimbursement schedule for dispensing fees. Lower volume pharmacies selling fewer prescriptions than 35,000 per year would be reimbursed at a higher rate than high volume pharmacies selling 35,000 or more per year. The dispensing fee assigned each group was periodically increased through 1984.

DSHS contracted another cost survey conducted by the Washington State Pharmaceutical Association (WSPA) in 1980. In 1984, DSHS moved to the current 3-tiered system

for dispensing fees that breaks providers into three groups: 35,000 prescriptions or more per year, 15,000 to 35,000, or fewer than 15,000. Pharmacies are surveyed annually to update volume levels, and a pharmacy may seek reevaluation of its volume level by submitting its prescription data over 6 months.

The second reimbursement factor, ingredient costs, also follows a schedule system of reimbursement. Until 1982, ingredient cost reimbursement was fixed by the lower of: (1) maximum allowable cost (MAC), a price list for generic drugs; or (2) actual acquisition cost (AAC), the full average wholesale price (AWP) based on published reports from wholesalers on their actual prices. *See* former WAC 388-91- -040 (Supp. 1978-1979). Based on field audits of pharmacies and the 1980 survey, DSHS changed in 1982 to the current estimated acquisition cost (EAC) system, WAC 388-91-040, and began to reimburse ingredient costs at the lower of the MAC or a percentage of the AWP. Originally set at 90 percent of the AWP for most drugs, DSHS lowered the EAC schedule to the current rate of 89 percent in 1984.

DSHS notified providers of the changes in reimbursement schedules by policy memoranda 10 days before implementation. It neither published public notice nor provided an opportunity for public comment. DSHS has stated that the 1980 survey and subsequent reimbursement schedules did not consider profit and did not reimburse all costs. Plaintiffs continued to perform and receive payment under the changed reimbursement schedules and the Agreements; J&M went out of business in 1987, but Failor's and Sav-On continue to perform and receive payments to date.

On August 21, 1987, Plaintiffs brought an action against Defendant in Thurston County Superior Court. The Complaint requests injunctive relief to invalidate the 1978 and 1984 reimbursement schedule changes for failure to comply with rule-making procedures of the former administrative procedure act (APA), RCW 34.04.010(2)(c) (1987), and seeks damages for past losses under those reimbursement systems. The trial court granted Plaintiffs' Motion for Partial Sum-

mary Judgment and invalidated the reimbursement schedules. The court's Order held: (1) The setting of reimbursement schedules constituted rules within the meaning of the APA; (2) no contractual or statutory provision exempted the schedules from APA rule-making procedures; and (3) Defendant's failure to comply with the APA rendered the schedules invalid. The trial court further denied Defendant's Cross Motion for Summary Dismissal of the Complaint. The issue of damages was reserved for trial. The Supreme Court then granted discretionary review upon Defendant's Petition.

I

The first issue before this court is whether the trial court's Summary Judgment Order invalidating the reimbursement schedules for failure to comply with APA rule-making procedures was proper. When reviewing an order for summary judgment, the appellate court engages in the same inquiry as the trial court. *Syrovy v. Alpine Resources, Inc.*, 122 Wn.2d 544, 548 n.3, 859 P.2d 51 (1993). This court will affirm summary judgment if no genuine issue of any material fact exists and the moving party is entitled to judgment as a matter of law. CR 56(c). All facts and reasonable inferences are considered in the light most favorable to the nonmoving party, *Taggart v. State*, 118 Wn.2d 195, 199, 822 P.2d 243 (1992), and all questions of law are reviewed de novo, *Syrovy*, 122 Wn.2d at 548 n.3. This court will sustain the trial court's judgment upon any theory established in the pleadings and supported by proof. *Wendle v. Farrow*, 102 Wn.2d 380, 382, 686 P.2d 480 (1984).

For rule-making procedures to apply, an agency action or inaction must fall into the APA definition of a rule. Former RCW 34.04.010(2). The court will consider this challenge to reimbursement rates established in 1978 and 1984 under the APA in place prior to 1988. We note, however, the Legislature carried over the prior definition into the current act and that cases interpreting the latter may illuminate the former. *See* RCW 34.05.010(15).

■ The definition of a rule under the Washington statute, unlike that in the federal or other state APA's, is inclusive and specifies two elements required to qualify an agency action as a rule. *State v. Straka*, 116 Wn.2d 859, 868, 810 P.2d 888 (1991). First, the action must be "any agency order, directive, or regulation of general applicability". Former RCW 34.04.010(2). In addition, the action must also fall into one of five enumerated categories:

> (a) the violation of which subjects a person to a penalty or administrative sanction; (b) which establishes, alters, or revokes any procedure, practice, or requirement relating to agency hearings; (c) which establishes, alters, or revokes any qualification or requirement relating to the enjoyment of benefits or privileges conferred by law; (d) which establishes, alters, or revokes any qualifications or standards for the issuance, suspension, or revocation of licenses to pursue any commercial activity, trade, or profession; or (e) which establishes, alters, or revokes any mandatory standards for any product or material which must be met before distribution or sale. . . .

Former RCW 34.04.010(2). The trial court held the reimbursement schedules constituted an order, directive, or regulation of general applicability relating to a benefit conferred by law and, thus, are rules. We agree.

■ Defendant argues that the reimbursement schedules do not qualify as an order, directive, or regulation but are merely offers for the amount DSHS will pay if the provider chooses to provide services. The mere inclusion of these schedules in a contract offer has no marked significance. The core provider Agreements also refer to statutes and other regulations, all of which may serve as the terms of the offer to which the provider agrees upon performance without disturbing their legislative nature. We observe other state and federal courts have rejected the same argument under their broader APA's: "[S]tate agencies may not evade rulemaking by contract." *NME Hosps., Inc. v. Department of Social Servs.*, 850 S.W.2d 71, 75 (Mo. 1993); *see also Seneca Nursing Home v. Kansas State Bd. of Social Welfare*, 490 F.2d 1324, 1332-33 (10th Cir.), *cert. denied sub nom. Secretary of Social & Rehabilitation Servs. v. Seneca Nursing Home*, 419 U.S. 841 (1974); *Senn*

*Park Nursing Ctr. v. Miller,* 104 Ill. 2d 169, 470 N.E.2d 1029 (1984).

The key to the application of the APA definition in this case depends upon the characterization of the dispensing fee and ingredient cost schedule changes as actual payments or as reimbursement methodology. We emphasize Plaintiffs do not challenge the calculation of their individual payments, nor do they suggest that Defendant's periodic adjustments to the flat rates assigned to each tier of the dispensing fee require rule-making procedures. Likewise, Defendant does not dispute that the APA does mandate rulemaking to promulgate its state drug pricing regulations laid out in WAC 388-91-040.

Defendant contends, however, the schedules are not generally applicable because each provider group has a different payment amount and each may accept or reject that amount in its individual contract. An action is of general applicability if applied uniformly to all members of a class. *Simpson Tacoma Kraft Co. v. Department of Ecology,* 119 Wn.2d 640, 648, 835 P.2d 1030 (1992) (applying 1988 APA). As this court explained in *Simpson Tacoma Kraft Co.,* where the challenge is to a policy applicable to all participants in a program, not its implementation under a single contract or assessment of individual benefits, the action is of general applicability within the definition of a rule. *Simpson Tacoma Kraft Co.,* 119 Wn.2d at 648. *Accord National Ass'n of Psychiatric Treatment Ctrs. v. Weinberger,* 658 F. Supp. 48, 53-54 (D. Colo. 1987) (holding that reimbursement schedules for contracted health care providers are uniformly applicable). Accordingly, we held in *Simpson Tacoma Kraft Co.* that an agency's formulation of a numeric water quality standard was a directive of general applicability because the agency applied the formula uniformly across all dischargers in the class; that the ultimate calculation of each entity's discharge would be individual was irrelevant. *Simpson Tacoma Kraft Co.,* 119 Wn.2d at 647-48.

The reimbursement schedules here are likewise uniformly applied to all members of the class of Medicaid prescription

providers and thus generally applicable. The schedules constitute additions to and refinements of reimbursement methodology, not mere applications of existing regulations. WAC 388-91-040(4) states the maximum fee as the lower of ingredient cost plus dispensing fee or the provider's usual and customary charge, then lays out the broad methodology for setting each: the EAC for ingredient costs and the use of surveys for the dispensing fee. It does not specify use of the tier system or methodology to set the AWP; this methodology appears only in the dispensing fee and ingredient cost reimbursement schedules issued by Defendant without rule-making procedures.

Defendant further asserts that because providers have neither statutory nor contractual rights to payment until performance and can withdraw from the program at any time, the reimbursement schedules cannot "relat[e] to the enjoyment of benefits or privileges conferred by law". Former RCW 34.04.010(2)(c). Ample authority exists to support Defendant's contention that Plaintiffs are not beneficiaries within the meaning of the APA. Providers are not legally required to participate in Medicaid. *Department of Social & Health Servs. v. Latta*, 92 Wn.2d 812, 820, 601 P.2d 520 (1979). Likewise, the right to actual payment does not arise until performance of the unilateral contract and must be calculated by the reimbursement methodology in place at the time of performance. *Caritas Servs., Inc. v. Department of Social & Health Servs.*, 123 Wn.2d 391, 414, 869 P.2d 28 (1994). Moreover, federal courts have held enrollment as a Medicaid provider does not create a property interest in either continued participation, *i.e.*, subsequent reimbursement contracts, *Kelly Kare, Ltd. v. O'Rourke*, 930 F.2d 170, 176 (2d Cir.), *cert. denied*, 112 S. Ct. 300 (1991); *Geriatrics, Inc. v. Harris*, 640 F.2d 262, 264-65 (10th Cir.), *cert. denied sub nom. Geriatrics, Inc. v. Schweiker*, 454 U.S. 832 (1981), or status as a qualified provider, *Senape v. Constantino*, 936 F.2d 687, 690 (2d Cir. 1991). In addition, the Tenth Circuit has specifically rejected a provider's economic dependence on Medicaid patients as a basis for finding a property interest

in certification as a Medicaid provider. *Geriatrics, Inc.*, 640 F.2d at 265.

The trial court relied on *Ocosta Sch. Dist. 172 v. Brouillet*, 38 Wn. App. 785, 790-91, 689 P.2d 1382, *review denied*, 103 Wn.2d 1009 (1984), to find a benefit conferred by law. In *Ocosta*, the Court of Appeals held it "self-evident" that allocation of state education funds constituted a benefit conferred by law and required rule-making procedures to deduct timber sale proceeds from a school's annual allocation. *Ocosta Sch. Dist. 172*, 38 Wn. App. at 791. The trial court here determined the allocation of state Medicaid funds was an analogous benefit to Medicaid patients; it follows a change in reimbursement schedules for Medicaid prescriptions would alter enjoyment of that benefit.

We concur with the analysis of the trial court. Once again, the inclusion of the reimbursement schedules in a unilateral contract does not preclude their status as a rule. Likewise, any opportunity for providers to "comment" by withdrawing from the program is irrelevant. The benefit of the Medicaid program runs to the Medicaid patient, RCW 74.09.200, and its enjoyment is altered by the change in reimbursement rates. *See also Geriatrics, Inc.*, 640 F.2d at 265; *National Ass'n of Psychiatric Treatment Ctrs.*, 658 F. Supp. at 53 n.7. By insulating reimbursement schedule changes from rule-making requirements Defendant denied notice and comment to those intended beneficiaries of the program.

The remedy for failure to comply with applicable APA rule-making procedures is invalidation of the action. Former RCW 34.04.025(5). We agree with the ruling of the trial court that no contractual or statutory exemption exists. Consequently, we hold the reimbursement schedules are procedurally invalid.

II

We are left with the remainder of Defendant's Cross Motion for Summary Dismissal, the issue of whether Plaintiffs can make out a claim for damages. Defendant contends that dismissal of Plaintiffs' claim for additional reimbursement is compelled by this court's decision in *Multicare Med.*

*Ctr. v. Department of Social & Health Servs.*, 114 Wn.2d 572, 790 P.2d 124 (1990). Plaintiffs argue that *Multicare* does not apply to the facts at hand and, regardless, facts exist to challenge the formation or enforceability of the Agreements.

This court made clear in *Multicare* that Medicaid core provider Agreements establish express unilateral contracts with definite terms for payment incorporated by reference to payment schedules. *Multicare*, 114 Wn.2d at 588; *see also Caritas Servs., Inc. v. Department of Social & Health Servs.*, 123 Wn.2d 391, 404, 869 P.2d 28 (1994). In *Multicare*, plaintiff hospitals participating in the state-funded medically indigent and general assistance unemployable medical care services programs challenged DSHS regulations establishing variable reimbursement rate reductions. Just as in the present case, DSHS had purchased health care services from the hospitals through core provider agreements, pursuant to RCW 74.09.120. The *Multicare* agreements used language similar to the Agreements in the present case, failing to specify reimbursement rates or methodology for calculation and instead incorporating DSHS standards by reference. *Multicare*, 114 Wn.2d at 576.

Upon determining that the Agreements represented unilateral offers for payment, the *Multicare* court employed traditional contracts analysis to evaluate whether the parties formed a contract under the facts. *Multicare*, 114 Wn.2d at 580. The court found voluntary performance by providers furnished consideration and evidence of mutual intent. *Multicare*, 114 Wn.2d at 584, 587; *see Everett v. Estate of Sumstad*, 95 Wn.2d 853, 855, 631 P.2d 366 (1981); *Browning v. Johnson*, 70 Wn.2d 145, 148-49, 422 P.2d 314, 430 P.2d 591 (1967). As a result, the *Multicare* court held the contracts were valid and enforceable, thus barring a claim for further reimbursement. *Multicare*, 114 Wn.2d at 588.

The *Multicare* analysis undoubtedly applies to the case at hand, calling for examination of the Agreements as unilateral contracts. Both cases involve challenges to Medicaid reimbursement schedules referenced in nearly identical core provider Agreements. The contracts in the present case,

however, differ from those in *Multicare*: the reimbursement schedule changes in *Multicare* occurred by valid rulemaking.

A contract in conflict with statutory requirements is illegal and unenforceable as a matter of law. *Hederman v. George*, 35 Wn.2d 357, 362, 212 P.2d 841 (1949); *Machen, Inc. v. Aircraft Design, Inc.*, 65 Wn. App. 319, 333, 828 P.2d 73, *review denied*, 120 Wn.2d 1007 (1992). In addition, a government contract beyond an agency's authority is void and unenforceable. *Chemical Bank v. WPPSS*, 99 Wn.2d 772, 797-98, 666 P.2d 329 (1983); *Noel v. Cole*, 98 Wn.2d 375, 378-79, 655 P.2d 245 (1982). Even where a contract is within an agency's substantive authority, failure to comply with statutorily mandated procedures is ultra vires and renders the contract void. *Noel*, 98 Wn.2d at 379-80. Moreover, where the government action was not substantively ultra vires or manifestly against public policy a good faith private party is entitled to recover for losses on the void contract under the doctrine of quantum meruit. *Noel*, 98 Wn.2d at 381. In addition, we acknowledge a decision by the Seventh Circuit facing facts similar to those here and holding where a state has invalidly set Medicaid reimbursement rates, providers may be entitled to recovery based on the prior, valid rates. *Wisconsin Hosp. Ass'n v. Reivitz*, 820 F.2d 863, 869 (7th Cir. 1987).

Although Plaintiffs have offered various theories upon which to challenge the contracts, the invalidity of the reimbursement schedules suffices to overcome a motion for summary dismissal. Whether Plaintiffs indeed recover damages will be determined at trial. Defendant's additional contentions that Plaintiffs' claims are barred by laches and estoppel are without merit.

UTTER, BRACHTENBACH, DURHAM, SMITH, GUY, JOHNSON, and MADSEN, JJ., concur.

ANDERSEN, C.J., concurs in the result.

Reconsideration denied February 9, 1995.