[No. 23231-6-II.    Division Two.    July 23, 1999.]

McGee Guest Home, Inc., et al., *Respondents*, v. The Department of Social and Health Services, et al., *Appellants*.

*Christine O. Gregoire, Attorney General*, and *Carl Berton Paul, Assistant*, for appellants.
*John Francis Sullivan*, for respondents.

HUNT, J. — The Washington Department of Social and Health Services (DSHS) appeals a summary judgment ruling that it promulgated reimbursement rates in violation of the Administrative Procedure Act (APA); this ruling allows congregate care facilities serving mental health patients to recover financial losses based on the equitable remedy in quantum meruit. Holding that these DSHS reimbursement rates are not subject to APA rule-making procedures, we reverse and remand.

## FACTS

### I. CONGREGATE CARE SERVICES

RCW 74.08.045[1] authorizes DSHS to purchase congregate care services from private providers at reasonable rates. Several congregate care facilities, including McGee Guest Home, Inc., contracted with DSHS to provide services to eligible mental health patients. The contracts were for a definite term, renewed regularly.[2]

In 1977, DSHS promulgated a rule authorizing itself to set the congregate care reimbursement rate. Washington Administrative Code (WAC) 388-29-130 (1977). In 1978, DSHS issued to all congregate care facilities a letter setting

---

[1]RCW 74.08.045 was enacted in 1969.

[2]For example, the contractual relationship between McGee and DSHS began on May 26, 1982, and was renewed for several subsequent terms until the contract expired on June 30, 1993.

a two-tiered reimbursement rate based on the number of beds occupied in a facility: Facilities with 3 to 15 beds were to be paid at a different rate than facilities with 16 or more beds.

The contracts between the Facilities[3] and DSHS ended on June 30, 1993, when legislation changed the mental health care system in Washington. *See generally* RCW 71.24. Under this new statutory scheme, DSHS no longer contracted directly with facilities to provide congregate care services. Instead, DSHS contracted with local Regional Support Networks (RSNs), which in turn contracted with facilities to provide community mental health care. RCW 71.24.025(14). After June 30, 1993, the Facilities continued to provide congregate care services under contract with local RSNs.

## II. LAWSUIT

On June 20, 1995, the Facilities filed suit against DSHS in Thurston County Superior Court. They complain that: (1) DSHS failed to reimburse the Facilities adequately for the cost of providing care to mental health residents; (2) DSHS did not properly promulgate the reimbursement rates under Washington's Administrative Procedure Act, RCW 34.05; (3) the rate DSHS paid did not take into consideration the Facilities' costs or profits, causing them to suffer financial losses; and (4) the court should grant declaratory relief and issue a writ of mandamus directing DSHS to develop an adequate mental health reimbursement rate schedule.

DSHS moved for partial summary judgment, raising two issues: (1) The Facilities' action was based in equity and, therefore, the three-year statute of limitations applied, which would limit the Facilities' earliest claims to June 29,

---

[3]The congregate care facilities are: McGee Guest Home, Inc.; Valley Community Inn; Court C Residential Center; IDE Congregate Care, Inc.; Tacoma Congregate Care, Inc., and Memory Lane/Oak Hill, Inc., which operates Memory Lane, Oak Hill, and Hilltop Center. For ease of identification, we refer to them collectively as "the Facilities."

1992; (2) the APA was amended to exclude this type of rate setting from rule-making provisions, and, consequently, the Facilities had no cause of action for rates paid after June 9, 1994, the amendment's effective date. The Facilities replied that: because their action was based on written contracts, the six-year statute of limitations applied; the contracts were continuing in nature; and the Facilities could recover mental health care reimbursement amounts dating back to the initial pre-1992 contract dates. The trial court ruled that the six-year statute of limitations applied and denied DSHS' motion for partial summary judgment.

Again DSHS moved for summary judgment, arguing that: (1) the rates were validly set by a rule, WAC 388-29-130, which incorporated the rates set by DSHS; (2) the contracts contained a dispute resolution clause, with which the Facilities had failed to comply; (3) the contracts provided a "change and modification" remedy; (4) the contractual remedy barred equitable claims; (5) the contracts were not continuing because each had a definite term; and (6) the Facilities had no contractual relationship with DSHS after June 30, 1993 (when the Facilities contracted with the RSNs). The Facilities also moved for summary judgment, asking the court to find that the reimbursement methodology used by DSHS was subject to rule making under the APA, and to invalidate the payment schedule set by DSHS because it was not promulgated according to APA rule-making procedures.

The trial court granted summary judgment in part and denied it in part, ruling that: (1) the Medicaid mental health reimbursement rates were subject to APA rule making and were improperly promulgated by DSHS; (2) the Facilities were entitled to recover under the equitable theory in quantum meruit; (3) the contracts were not continuing in nature; (4) all Facilities' claims before June 20, 1989, were barred; and (5) there remained material questions of fact concerning the contractual relationship between the Facilities and DSHS after June 30, 1993. The trial court denied summary judgment with respect to the post-June

1993 claims, directed that final judgment be entered on plaintiffs' behalf under CR 54(b),[4] and entered judgment in favor of the Facilities concerning liability on the pre-June 1993 contracts.

## ANALYSIS

### I. STANDARD OF REVIEW

■ In reviewing an order of summary judgment, we conduct the same inquiry as the trial court. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). Summary judgment is proper if, when viewed in a light most favorable to the nonmoving party, pleadings, depositions, affidavits, and admissions show that there is no genuine issue of material fact and a party is entitled to judgment as a matter of law. *Id*. Having conducted this inquiry, we disagree with the trial court's grant of partial summary judgment based on its conclusion that these mental health reimbursement rates are subject to APA rule-making requirements under the rationale of *Failor's Pharmacy v. Department of Social & Health Services*, 125 Wn.2d 488, 886 P.2d 147 (1994).

### II. RATE SCHEDULES AS APA RULES

■ To qualify a state agency action as a "rule" under the APA, two elements are required:

First, the action must be *"any agency order, directive, or regulation of general applicability."* Former RCW 34.04.010(2). In addition, the action must also fall into one of five enumerated categories:

(a) the violation of which subjects a person to a penalty or administrative sanction; (b) which establishes, alters, or revokes any procedure, practice, or requirement relating to agency hearings; (c) *which establishes, alters, or revokes any*

---

[4]When there is no just reason for delay, the court may direct that an order which affects some, but not all, claims, be considered final. CR 54(b). This certification allows appellate review of trial court orders that are not usually considered final. RAP 2.2(d).

*qualification or requirement relating to the enjoyment of benefits or privileges conferred by law*; (d) which establishes, alters, or revokes any qualifications or standards for the issuance, suspension, or revocation of licenses to pursue any commercial activity, trade, or profession; or (e) which establishes, alters, or revokes any mandatory standards for any product or material which must be met before distribution or sale[.]

*Failor's*, 125 Wn.2d at 494 (emphasis added); RCW 34.05-.010(16).

## A. Prescription Reimbursement Rates As APA Rules Under *Failor's*

In *Failor's*, DSHS changed the methodology by which it reimbursed Medicaid providers for prescription drugs, without first subjecting the proposed change to required APA rule-making procedures.[5] *Id.* at 490. Federal law mandated that all state Medicaid agencies reimburse prescription providers at a rate based on two factors: (1) the actual or estimated cost of acquiring drug ingredients, and (2) a dispensing fee.[6] *Id.* at 491. Following the federal mandate, DSHS promulgated WAC 388-91-040(4), which established DSHS methodology for determining prescription reimbursement rates.[7] *Failor's*, 125 Wn.2d at 491.

---

[5]Under Washington's Administrative Procedure Act, to promulgate a rule, an agency must publish the proposed rule, give notice of a public hearing on the rule, promulgate it with a concise explanatory statement, and maintain a rule-making file. RCW 34.05.310-395. Essentially, the agency must provide notice to the public and an opportunity to be heard concerning the proposed rule.

[6]42 C.F.R. § 447.331.

[7]This 1994 regulation provided:

The department shall not pay more than the lower of ingredient cost plus a dispensing fee or the provider's usual and customary charge to the public. Ingredient cost shall be set at the estimated acquisition cost, which is the department's best estimate of the price providers generally are paying for a drug. The dispensing fee will be set by taking into account the results of surveys and the costs of pharmacy operation. Reimbursement may also be made through exclusive service contracts for the provision of prescription drugs for nursing home patients.

WAC 388-91-040(4).

But DSHS then departed from the federal mandate. It adopted a two-tiered reimbursement methodology setting the rates, in part, based on a third factor—the number of prescriptions the provider filled; low volume pharmacies would be reimbursed at a higher rate than high volume pharmacies selling 35,000 or more prescriptions per year. *Failor's*, 125 Wn.2d at 491. Moreover, in departing from the specified methodology, DSHS did not follow the required APA rule-making procedures, particularly with respect to public notice;[8] rather, DSHS gave notice of this change merely by issuing to pharmacists a policy memoranda 10 days before implementation. *See id.* at 492.

The Washington Supreme Court held that DSHS' prescription reimbursement methodology in *Failor's* constituted a "rule" under the APA because the methodology "established, altered, or revoked" a benefit conferred by law and was of general applicability to all members of a class; thus, the prescription reimbursement methodology was required to be promulgated according to the APA rule-making procedures.[9] *Id.* at 494-95. The court then held that the contractual reimbursement rates were invalid because the methodology used to set them had not been promulgated under the APA. *Id.* at 499. Because the contract was therefore void, prescription providers could seek recovery based on the equitable remedy in quantum meruit: Prescription providers could recover the difference between the invalid amount DSHS paid and the amount DSHS should have paid according to the federally mandated methodology. *Id.*

## B. Mental Health Reimbursement Rates Are Not APA Rules; *Failor's* Inapplicable

■ The facts differ here from the facts in *Failor's*. In

---

[8]*See supra* note 5.

[9]*See supra* note 5.

*Failor's* a statute *mandated* the methodology DSHS was to use in calculating the prescription reimbursement rate. But DSHS did not follow this methodology, nor did DSHS give proper notice of the proposed change.

Here, however, the statute merely *authorizes* DSHS to purchase mental health services from care providers at a "reasonable rate"; the statute does not dictate specific methodology to be used in setting such rate. RCW 74.08.045. DSHS promulgated WAC 388-29-130,[10] which provided that DSHS would set the rate; again, no methodology for calculating the rate was prescribed. Thus, when DSHS set mental health care reimbursement rates using the two-tiered system (based on the number of beds), it did not change any mandated methodology.

In *Failor's*, the court ruled that DSHS could change the *methodology* used to determine prescription reimbursement rates only according to APA rule making:

> The key to the application of the APA definition in this case depends upon the characterization of the dispensing fee and ingredient cost schedule changes as actual payments or as reimbursement methodology. *We emphasize Plaintiffs do not* challenge the calculation of their individual payments, nor do they *suggest that Defendant's periodic adjustments to the flat rates assigned to each tier of the dispensing fee require rule-making procedures.*
>
> . . . .
>
> The reimbursement schedules here are likewise uniformly applied to all members of the class of Medicaid prescription providers and thus generally applicable. The schedules constitute additions to and refinements of reimbursement methodology, *not mere applications of existing regulations*. WAC 388-91-

[10]Promulgated in 1977, WAC 388-29-130 provided in pertinent part that "[t]he cost standard for congregate care shall be the rate established by the department for payment to specific congregate care facilities." Aside from periodically adjusting the monthly patient allowance, the rule remained relatively unchanged until 1984, when DSHS published the actual two-tier rate schedule in the rule. WAC 388-29-130 (1984). In 1986, the rule was again amended, returning to the original language, dropping the rate schedule and providing that DSHS would set the rate. In 1993, when the legislature revamped the mental health care system, this WAC was repealed in favor of the RSN system of reimbursement.

-040(4) states the maximum fee as the lower of ingredient cost plus dispensing fee or the provider's usual and customary charge, then lays out the broad methodology for setting each: the EAC (estimated acquisition cost) for ingredient costs and the use of surveys for the dispensing fee. It does not specify use of the tier system or methodology to set the AWP (average wholesale price); this methodology appears only in the dispensing fee and ingredient cost reimbursement schedules issued by Defendant without rule-making procedures.

*Failor's*, 125 Wn.2d at 495-96 (emphasis added). The *Failor's* court held that when DSHS used the two-tiered methodology to set medicaid *prescription* reimbursement rates, it thereby changed the rate-setting methodology without following proper rule-making procedures under the APA, thus rendering the rate invalid.

In contrast, here, there was no methodology specified for setting *mental health* reimbursement rates. Rather, DSHS properly promulgated WAC 388-29-130, which authorized DSHS to set these rates, and DSHS's rate setting merely implemented the sole statutory requirement that rates be "reasonable." RCW 74.08.045. Moreover, these rates do not qualify as "rules" under the APA statutory definition; although the rates are of general applicability, the rate changes did not "establish, alter, or revoke" any qualification or requirement relating to a benefit conferred by law. *See* RCW 34.05.010(16). Again, the basic statutory requirement for setting the mental health reimbursement rate remained unchanged, namely that the rate be "reasonable." RCW 74.08.045. Accordingly, DSHS may adjust this rate as contributing factors used to set a reasonable rate fluctuate, without being subject to APA rule making.

We hold that under these circumstances, the mental health reimbursement rates set by DSHS do not constitute rules under the APA and, therefore, need not be promulgated in accordance with APA rule making. Therefore, the Facilities cannot maintain this claim against DSHS in its present posture, and we do not address the remaining issues. We reverse McGee's summary judgment and remand for entry of summary judgment in favor of DSHS.

ARMSTRONG, A.C.J., and HOUGHTON, J., concur.

Review granted at 140 Wn.2d 1001 (2000).