## NOTICE:  SLIP OPINION
## (not the court's final written decision)

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
DECEMBER 8, 2022

*González C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
DECEMBER 8, 2022

ERIN L. LENNON
SUPREME COURT CLERK

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| NORTHWEST PULP & PAPER ASSOCIATION; THE ASSOCIATION OF WASHINGTON BUSINESS; AND WASHINGTON FARM BUREAU, | ) ) ) ) | No. 100573-3 |
|  | ) | En Banc |
| Petitioners, | ) ) |  |
|  | ) | Filed: December 8, 2022 |
| v. | ) ) |  |
| STATE OF WASHINGTON, DEPARTMENT OF ECOLOGY, | ) ) ) |  |
|  | ) |  |
| Respondent. | ) ) |  |

OWENS, J.—The Department of Ecology (Department) issues a *Water Quality Program Permit Writer's Manual* (*Manual*) to provide technical guidance to its staff tasked with drafting permits for entities that discharge pollutants into Washington's waterways. In 2018, the Department revised the *Manual* and added a new section, chapter 6, section 4.5 (Section 4.5), which addressed methods permit writers can use to identify and measure polychlorinated biphenyls (PCBs) discharged into our waters.

*Northwest Pulp & Paper Association, et al. v. Department of Ecology*
No. 100573-3

This specific revision was challenged on the grounds it constituted rule making outside of the Administrative Procedure Act (APA), chapter 34.05 RCW.

Like the courts below, we hold that Section 4.5 is not a rule for purposes of the APA because it merely guides permit writers, who have discretion to choose test methods on a case-by-case basis, and does not require the uniform application of a standard to an entire class of entities who discharge PCBs. Accordingly, we affirm the courts below and remand for any further proceedings necessary to carry out this opinion.

## FACTS

In order to restore and maintain the chemical, physical, and biological integrity of the nation's waters, the Clean Water Act prohibits the discharge of any pollutant without a permit issued in compliance with the National Pollution Discharge Elimination System (NPDES). 33 U.S.C. §§ 1311(a), 1342(a)(1). Among the pollutants subject to regulation are PCBs. 40 C.F.R. § 129.4(f). Although PCBs were banned by the United States Environmental Protection Agency (EPA) in 1976, they remain a major environmental concern due to their toxicity, ubiquity, persistency, and tendency to bioaccumulate. Administrative Record (AR) at 0922.0004. Any entity that discharges PCBs into the waterways must have a discharge permit and comply with discharge limits as well as monitoring and reporting requirements. 40 C.F.R. § 122.21(a).

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State Water Quality Authority and Standards*

In Washington, the Department is responsible for establishing water standards and for administering the NPDES permit program. 33 U.S.C. § 1342(b); RCW 90.48.260(1). If a discharger violates or has the "reasonable potential" to violate water quality standards by discharging a particular pollutant, the discharger's NPDES permit must contain effluent limitations for that pollutant. 40 C.F.R. § 122.44(d)(1)(iii). An effluent limit is a restriction on the quantity, rate, and concentration of a pollutant discharged into the waters of the state. AR at 0164.0021. Currently, EPA-approved Method 608.3 has a detection limit for PCBs of .065 µg/L (micrograms per liter). 40 C.F.R. § 136.3 tbl.IC. However, Washington's water quality standards set a much lower numeric effluent limit for concentrations of PCBs at 0.00017 µg/L. WAC 173-201A-240.

*PCB Test Methods*

PCBs are groups of 209 individual compounds known as congeners. AR at 0922.0004. Specific mixtures of congeners were originally produced under the trade name Aroclor. *Id.* Both Method 608.3 and Method 8082A measure the total amount of PCBs present but have only limited ability to identify individual PCB congeners. *Id*. at 0922.0005. Method 1668C can measure concentrations of individual congeners and may be helpful when identifying the source of PCBs on the site. AR at 0164.0263-64. However, the individual congener method is more expensive and

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

difficult to perform. AR at 0922.0005. The federal regulations state that Method

1668C "may be useful for determination of PCBs as individual chlorinated biphenyl

congeners," but as of the latest revision of the federal regulations, the method had not

been approved for use. 40 C.F.R. § 136.3, app. A, Method 608.3 (list of current EPA-

approved methods for testing PCB).

*The Manual*

At issue here is whether the Department inappropriately promulgated a rule

when it revised the *Manual* to include additional test methods 1668C and 8082A. If

the new section is a rule, the Department would have been required to follow APA

rule making procedures.

The *Manual* provides "technical guidance and policy" for permit writers who

develop wastewater discharge permits in Washington State. AR at 0164.0031.

Section 4.5 states that Methods 8082A and 1668C "may be used for permitting

purposes to evaluate sources, but not for numeric effluent limit compliance." AR at

0164.0250; *see also* AR at 0164.0261. Thus, permit writers *must* use Method 608.3 to

determine compliance, but permit writers *may* use data collected by Methods 1668C

and 8082A when evaluating a discharger's reasonable potential to violate water

quality standards. AR at 0164.0250, .0261.

Section 4.5 also notes that PCBs are subject to Washington's regulatory

requirement that all known, available, and reasonable methods of treatment (AKART)

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

are used to control pollutants. WAC 173-220-130; RCW 90.48.520; AR at 0164.0263. AKART includes best management practices, some of which may require the use of Methods 1668C and/or Method 8082A. *See* AR at 0164.0263-64.

*Procedural Background*

Northwest Pulp and Paper Association, the Association of Washington Business, and Washington Farm Bureau (collectively NWPP) petitioned for judicial review and declaratory judgment under the APA, asking the superior court to invalidate Section 4.5. They alleged that the Department promulgated a rule without complying with APA rule making requirements and exceeded its authority, and that the section is arbitrary and capricious. The superior court dismissed the petition and denied declaratory relief, concluding that Section 4.5 is not a rule under the APA.

The Court of Appeals affirmed, holding that NWPP failed to show that Section 4.5 was a "rule" under the APA definition because it is not a directive of general applicability. *Nw. Pulp & Paper Ass'n v. Dep't of Ecology*, 20 Wn. App. 2d 533, 535, 500 P.3d 231 (2021). The Court of Appeals did not address whether Section 4.5 fell into one of the enumerated categories requiring rule making in RCW 34.05.010(16).

NWPP petitioned this court for review, which was granted. *Nw. Pulp & Paper Ass'n v. Dep't of Ecology*, 199 Wn.2d 1010 (2022).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

ISSUES

1.      Does Section 4.5 of the *Manual* constitute a "rule" under the APA definition?

2.      Does Section 4.5 fall into one of the five enumerated categories that require rule making procedures under RCW 34.05.010(16)?

STANDARD OF REVIEW

Whether Section 4.5 is a rule as defined by the APA is a question of statutory interpretation the court reviews de novo. *Dep't of Ecology v. Campbell & Gwinn, LLC,* 146 Wn.2d 1, 9, 43 P.3d 4 (2002) (citing *State v. Breazeale*, 144 Wn.2d 829, 837, 31 P.3d 1155 (2001)).  If Section 4.5 is a rule, NWPP bears the burden of proving the rule is invalid. RCW 34.05.570(1)(a).  The court may declare a new rule invalid "only if it finds that: The rule violates constitutional provisions; the rule exceeds the statutory authority of the agency; the rule was adopted without compliance with statutory rule-making procedures; or the rule is arbitrary and capricious."  RCW 34.05.570(2)(c); *see also Wash. State Hosp. Ass'n v. Dep't of Health*, 183 Wn.2d 590, 595, 353 P.3d 1285 (2015).

ANALYSIS

Rules are invalid unless adopted in compliance with the APA.  *Hillis v. Dep't of Ecology*, 131 Wn.2d 373, 398, 932 P.2d 139 (1997).  Rule making procedures under the APA involve providing the public with notice of the proposed rule and an

6

*Northwest Pulp & Paper Association, et al. v. Department of Ecology*
No. 100573-3

opportunity to comment on the proposal. *Id.* at 399; RCW 34.05.320, .325. These procedures allow members of the public to meaningfully participate in the development of agency policies that affect them. *Hillis*, 131 Wn.2d at 399*; RCW 34.05.001.

We first consider whether Section 4.5 meets the APA's definition of a rule.

The APA definition of a rule contains two elements. RCW 34.05.010(16). First, a "rule" must be "any agency order, directive, or regulation of general applicability"; second, the rule must fall into one of five enumerated categories. *Id*.; *Failor's Pharmacy v. Dep't of Soc. & Health Servs*., 125 Wn.2d 488, 494, 886 P.2d 147 (1994). As a threshold matter, then, Section 4.5 must constitute an agency directive of general applicability to be a rule. It does not.

*Section 4.5 Is Not a Directive of General Applicability Because the Methods Described in the Section Do Not Apply Uniformly to All Members of a Class*

An action is of general applicability if it applies uniformly to all members of a class. *Failor's*, 125 Wn.2d at 494; *see also Simpson Tacoma Kraft Co. v. Dep't of Ecology*, 119 Wn.2d 640, 648, 835 P.2d 1030 (1992). Thus, a plaintiff must challenge a policy that applies to all participants in a program, and not how policy is being applied under a single contract or assessment of individual benefits. *Failor's*, 125 Wn.2d at 494; *Simpson,* 119 Wn.2d at 648.

The Court of Appeals, summarizing the holdings in *Failor's*, *Simpson*, and *Sudar v. Fish & Wildlife Comm'n*, 187 Wn. App. 22, 33, 347 P.3d 1090 (2015),

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

correctly observed that not every agency action carries the force of a rule. *Nw. Pulp & Paper*, 20 Wn. App. 2d at 546. In holding that Section 4.5 is not a rule, the court reasoned that "[w]here the agency action provides guidance for agency staff that (1) allows staff to exercise discretion, (2) provides for case-by-case analysis of variables rather than a uniform application of a standard, and (3) is not binding on the regulated community, the action does not constitute a directive of general applicability." *Id.*

NWPP argues that the Court of Appeals' observation set out a new standard for general applicability. Pet. for Review at 3, 18. We disagree. The Court of Appeals simply distilled the distinguishing characteristics of a rule of general applicability.

In *Failor's*, we considered a similar challenge brought by Medicaid prescription service providers to changes made by the Department of Health and Human Services to the Medicaid reimbursement schedule. 125 Wn.2d at 491-92. We rejected the Department's argument that the schedules were not generally applicable because each provider group had a different payment amount and could accept or reject the amount in their individual contract. *Id.* at 495. We had previously rejected a similar argument in *Simpson*, where the Department argued that its numeric standard for concentration of dioxin in the state's waters was not a rule because it applied to permittees individually and not as members of a class. 119 Wn.2d at 647-48.

But *Failor's* and *Simpson* do not apply here. In those cases, the departments promulgated generally applicable rules that applied without discretion. Here, the

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Manual* does not impose a uniform numeric standard or schedule that applies to all permittees who discharge PCBs. Instead, it vests considerable discretion in the permit writers.

First, Section 4.5 does not impose a uniform numeric standard or schedule because permit writers have the discretion to choose the type of monitoring necessary based on the circumstances of the facility. Before requiring any monitoring for PCBs, permit writers "should evaluate their facility and the potential for exceeding the water quality standard." AR at 0164.0260. In fact, PCB monitoring may not be necessary at all. *Id*. Permit writers are cautioned to "only include monitoring requirements when necessary for the facility and its specific discharge situation" and to "consider the value and purpose of requiring PCB monitoring." AR at 0164.0260-61. This discretion to choose a method on a case-by-case basis was totally absent in *Failor's*. There, even though the outcomes differed, the same reimbursement schedule was applied to all members of the community, which made the standards generally applicable. Here, different monitoring requirements apply depending on the circumstances of the facility, so no standard for testing is applied uniformly to all dischargers.

Second, a standard is not applied uniformly where permit writers have the option of exploring an alternative process altogether. Although permit writers are required to use the procedures outlined in the *Manual*, writers are also allowed to

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

discuss alternative processes with their supervisors. AR at 0164.0004, 0164.00033.

NWPP argues that in spite of the *Manual*'s language, recent permits have required the

use of Method 8082A or 1668C for monitoring discharge. Suppl. Br. of Pet'r at 19.

However, these requirements align with the EPA's recommendation to use best

management practices and there is nothing in the record to suggest that permit writers

have not been allowed to explore alternative processes.

Relying on *Hillis*, NWPP argues that the ability to exercise discretion does not

prevent an agency action from being an APA rule. *See* Suppl. Br. of Pet'r at 20-21.

*Hillis* considered the Department water permit priorities and prerequisites in the wake

of budget cuts. *Id*. at 397-98. We were not asked to decide whether these priorities

and prerequisites were of general applicability, as the Department conceded they

were. *Id*. In contrast, here, the Department has discretion to grant permits, and the

facts differ significantly. In this case, individual permit writers are given discretion to

choose among test methods depending on the circumstances of the permittee.

NWPP also argues that an agency action does not have to be legally

enforceable to be an APA rule. *See* Suppl. Br. of Pet'r at 20. However, we have stated

that "rules or declaratory orders adopted by an agency are enforceable, and a violation

'subjects a person to a penalty or administrative sanction.'" *Wash. Educ. Ass'n v.*

*Pub. Disclosure Comm'n*, 150 Wn.2d 612, 619, 80 P.3d 608 (2003) (quoting RCW

34.05.010(16)(a)); *see also Simpson*, 119 Wn.2d at 647 ("The APA defines a 'rule' as

'any agency order, directive, or regulation of general applicability . . . the violation of which subjects a person to a penalty or administrative sanction.'" (alteration in original) (quoting former RCW 34.05.010(15) (1988))). Conversely, a document that aids and assists in compliance with the law or interprets a statutory phrase without adding any requirements does not constitute a rule. *See id*.; *Budget Rent A Car Corp. v. Dep't of Licensing*, 144 Wn.2d 889, 897-98, 31 P.3d 1174 (2001). Following this reasoning, the Court of Appeals held that a policy document was not a rule because it did not impose an independent regulatory mechanism that operates with the force of law. *Sudar*, 187 Wn. App. at 33-34.

Here, the *Manual* specifically states that it is a "technical guidance and policy manual." AR at 0164.0031. The *Manual* "describes law and regulation pertaining to permitting"; it is "not regulation and should not be cited as a regulatory authority for any permit condition." AR at 0164.0033. Regulatory authority comes from the federal clean water act and the state's water quality standards set in WAC 173-201A-010 and RCW 90.48.520, but not the *Manual*. The Department did not create any additional requirements to the regulations that bind all dischargers of PCBs when it included Methods 8082A and 1668C as additional test methods.

In sum, the *Manual* does not impose a uniform standard on all dischargers because permit writers have the discretion to seek alternative processes, and any decisions about specific PCB testing requirements are necessarily made on a case-by-

11

case basis depending on the circumstances of each individual facility. Section 4.5 of the *Manual* provides guidance for permit writers and does not have any independent regulatory effect. Thus Section 4.5 does not constitute a directive of general applicability and is not a rule as defined by the APA.

To be properly characterized as a rule for purposes of the APA, it must both be of general applicability and fit within at least one of the five categories enumerated in RCW 34.05.010(16). Because NWPP has not shown that Section 4.5 satisfies the first element, we need not address whether Section 4.5 falls within one of the enumerated categories in satisfaction of the second element.

## CONCLUSION

We affirm the courts below and hold that the Department of Ecology did not invalidly promulgate a rule when it added Section 4.5 to its *Water Quality Program Permit Writer's Manual*. Accordingly, we affirm the courts below and remand for any further proceedings that may be necessary.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Northwest Pulp & Paper Association, et al. v. Department of Ecology*
No. 100573-3

Owens, J.

WE CONCUR:

González, C.J.

Gordon McCloud, J.

Johnson, J.

Yu, J.

Madsen, J.

Montoya-Lewis, J.

Stephens, J.

Whitener, J.

13