**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

**FILED**
**SEPTEMBER 14, 2023**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| CITY OF TACOMA, BIRCH BAY WATER AND SEWER DISTRICT, KITSAP COUNTY, SOUTHWEST SUBURBAN SEWER DISTRICT, and ALDERWOOD WATER & WASTEWATER DISTRICT, Municipal Corporations and Political Subdivisions of the State of Washington | ) ) ) ) ) ) ) ) ) | No. 39494-8-III |
| Respondents, | ) ) | PUBLISHED OPINION |
| v. | ) ) | |
| STATE OF WASHINGTON, DEPARTMENT OF ECOLOGY, | ) ) ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Respondents are all either local governments or special

purpose districts that own and operate public sewer systems and associated wastewater

treatment plants (WWTPs) discharging into Puget Sound (Sound). In 2019, the

Department of Ecology (Ecology) generated two documents discussing nitrogen pollution

in Puget Sound. One document recommended action to regulate nitrogen discharges to

the Sound and the other committed to doing so.

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

The respondents (hereafter Tacoma) sued to block regulation of their nitrogen discharges by arguing that these two documents improperly adopted three new rules in violation of the rulemaking provisions of chapter 34.05 RCW, the Administrative Procedure Act (APA). The superior court agreed with Tacoma. Ecology appeals.

We clarify the APA's definition of "rule" and conclude that "directive," for purposes of one APA component of "rule," includes an agency's directive to its staff to include new terms in permits. We conclude that the first and second purported rules are not "rules" within the APA's definition, but we conclude that the third purported rule is.

We affirm in part and reverse in part.

FACTS

The waters of Puget Sound extend from Olympia and the inside of the Olympic Peninsula north through the San Juan Islands up to Bellingham. Puget Sound is itself part of a greater body of water, known as the Salish Sea. The Salish Sea extends from the northern tip of Vancouver Island in British Columbia, south through the Strait of Georgia and the Strait of Juan de Fuca, continuing through the entirety of Puget Sound along the inside of the Olympic Peninsula. Some maps extend the Salish Sea further south along the Oregon Coast and include the mouth of the Columbia River.

2

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

Puget Sound and the Salish Sea are polluted. Some pollution is naturally caused. Other pollution is anthropogenic (i.e., human caused). Some of the human-caused sources of water pollution include shipping, fishing, fisheries, other forms of aquaculture, agricultural runoff, stormwater runoff, industrial waste, medical waste, garbage, oil and gas production, and discharges from WWTPs. This case concerns attempts to control pollution from WWTPs.

Since enactment of the Federal Water Pollution Control Act of 1972 (Clean Water Act or CWA), 33 U.S.C. § 1251 et seq., the United States has attempted to mitigate human-caused water pollution. Some of the mitigation tools adopted by the CWA, its amendments, and implementing regulations were monitoring and limiting discharges of biological oxygen-demanding pollutants, suspended solids, fecal coliform, pH (hydrogen ion concentration) impairing pollutants, and thermal impairing pollutants. *See* 33 U.S.C. § 1314(a). Another tool was requiring point source emitters of pollution to obtain a permit for the continued right to discharge pollutants into the waters of the United States. *See* 33 U.S.C. § 1342. These permits are known as "National Pollutant Discharge Elimination System (NPDES)" permits. Another tool was requiring industrial polluters to adopt "pretreatment" and requiring WWTPs to adopt "secondary treatment." *See* 33 U.S.C. § 1317(b), § 1311(b)(1)(B). Pretreatment seeks to reduce or eliminate

3

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

nonstandard pollutants prior to the pollutant entering a WWTP.[1]  40 C.F.R. § 403.3(s).

Secondary treatment typically consists of activated sludge, trickling filters, and/or

biological contactors intended to remove biodegradable organic pollutants.  Primary

treatment typically consists of screening, skimming, and settling to remove large solids

that sink, and oils and lighter solids that float to the surface.  Wastewater treatment also

typically includes some form of disinfection, such as application of chlorine, ozone, or

ultraviolet light.

Despite all these forms of treatment, many pollutants still remain in wastewater

discharged into the waters of the United States.  As technology and scientific knowledge

have continued to advance, additional forms of treatment have emerged.  Additional

treatment is often referred to as tertiary treatment, final treatment, or advanced secondary

treatment.  This additional treatment may refer to technology and agents that remove

pharmaceutical waste, micropollutants such as plastics, phosphorus, nitrogen, or any other

remaining unwanted substance.  In this case, tertiary treatment is used to refer to nitrogen

removal.

---

[1] Most WWTPs were originally designed to handle typical household and light commercial waste.

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

Some WWTPs in Washington already incorporate nitrogen removal, such as the Spokane Regional Water Reclamation Facility and the Budd Inlet Treatment Plant. Despite having been technologically feasible for several decades, tertiary treatment is not yet required for all WWTPs.

One of the primary impediments to wider adoption of tertiary treatment is cost. In 2017, the Chambers Creek Regional Wastewater Treatment Plant in Pierce County finished installation of a nitrogen removal system at a cost of $342 million. Individual plants may also be impeded by a lack of available land on which to construct new infrastructure or insufficient access to additional electricity. Other impediments are gaps in our knowledge.

Nitrogen, while commonly thought of as a beneficial nutrient, is also a pollutant. Simplified, excess nitrogen results in excess algal growth. Algae generate organic carbon. When carbon decomposes, it consumes



No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

oxygen. Depleted oxygen, or eutrophication, can render water incapable of supporting many forms of aquatic life.

Puget Sound contains many areas with low levels of dissolved oxygen (DO) as a result of excess nitrogen. More specifically, Puget Sound contains low oxygen in the strata where aquatic life has historically thrived.

What is unknown, at least within Puget Sound, is to what extent excess nitrogen in these strata is due to WWTPs. The Pacific Ocean is the largest source of nitrogen entering Puget Sound. The Pacific is believed to account for about 88 percent of the total nitrogen entering Puget Sound. Just because the Pacific is the largest source of nitrogen does not mean that it is the largest driver of oxygen depletion in the life-sustaining layers of the Sound.

Oceans and seas are complex ecosystems. The tides, water temperature, geography, and other variables impact flow and mixing among bodies of water. Most of the nitrogen that enters Puget Sound via the Pacific also flows back out. But the nitrogen entering Puget Sound from the Pacific is unlikely to have a significant negative impact on oxygen levels because water entering from the Pacific is usually colder, meaning it is denser than the water already in the Sound, causing the water from the Pacific to sink below the water already in the Sound. The negative impacts of excess nitrogen occur

6

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

closer to the surface, in the euphotic zone, where the sun's light allows for photosynthesis to occur. The euphotic zone is also where most marine life is found.

WWTPs emit significant amounts of nitrogen. Yet it is unknown to what extent this nitrogen causes DO impairment in Puget Sound. Nitrogen at the point of discharge can be measured, but one cannot determine where this nitrogen goes once the wastewater gets carried away on the currents and mixes with the rest of the Sound. Without this information, it is not possible to reasonably regulate nitrogen discharges from WWTPs. This is because anthropogenic pollutant discharges only violate Washington's clean water standard if it can be shown that human actions "cause the D.O. of that water body to decrease more than 0.2 mg/L." WAC 173-201A-210(1)(d)(1).

**Development of the Salish Sea Model**

To fill this knowledge gap, Ecology and the Pacific Northwest National Laboratory (PNNL) spent years developing the Salish Sea Model (SSM). The SSM is a predictive computer model that lets Ecology isolate and test water quality variables based on actual water quality data and predict water quality in areas where we do not currently have actual water quality measurements. It takes months to prepare the data to run a single scenario, days to run it through the SSM on one of PNNL's high powered computers, and additional time to interpret and report the data.

7

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

Some of the questions the SSM helps to answer are:

- "Are human sources of nutrients in and around the Salish Sea significantly impacting water quality now?  How bad might it get in the future?"
- "Where are the areas that are most sensitive to human impacts?  When are those effects the most harmful?"
- "How much do we need to reduce human sources of nutrients to protect water quality in the Salish Sea?"

Administrative Record (AR) at 104.  The model also allows Ecology to predict where and by how much DO levels would improve based on hypothetical nitrogen reductions.  The model also allows Ecology to test and quantify its hypothesis that DO levels are most impaired in Puget Sound's remote inlets and basins due to poor circulation resulting in pollutants accumulating and spending more time in those areas.

Despite its immense power, the SSM does have limits.  While the SSM can account for human-caused sources of pollution, the model cannot isolate the effect of individual WWTPs.  However, Ecology hopes to further refine the SSM "to define discharger-specific nutrient loading limits based on localized and far-field impacts." Clerk's Papers (CP) at 127.

Professors Gordon Holtgrieve and Mark Scheuerell from the University of Washington, scientists working with the regulated stakeholders, have also expressed concern that Ecology is overconfident in the SSM's predictive power.  Every predictive model has levels of uncertainty, often reported as confidence intervals.  In lay terms, these

8

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

scientists worry that the SSM is not yet ready for prime time because it appears to lack

sufficient sensitivity to confidently determine which segments of Puget Sound violate the

DO standard in WAC 173-201A-210 as a result of human-caused pollution. The SSM's

predictive accuracy is particularly important because many areas of Puget Sound are on

the edge of the state's DO water quality standard. These scientists are also concerned that

Ecology has not publicly shared sufficient information for others to independently verify

Ecology's interpretation of the results.

To be clear, this appeal is not about whether Ecology should be using the SSM to

inform regulation or whether it is accurate and reliable. This appeal is about whether

Ecology violated the APA by adopting rules without allowing for public comment during

its efforts to investigate and respond to human causes of DO depletion in Puget Sound.

In January 2019, Ecology published the results of its first three scenarios using the

SSM. The report, referred to as the Bounding Scenarios Report (BSR), modeled "a range

of climate and ocean conditions" from 2006, 2008, and 2014. CP at 34. The report

looked at current levels of pollution during those years and what would happen if nitrogen

and carbon discharges were reduced at all WWTPs, only midsize and large WWTPs, and

only large WWTPs. There are 79 WWTPs in the United States' portion of the Salish Sea.

9

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

The report's authors found that approximately 20 percent of Puget Sound did not meet Washington's DO water quality standards during each of the reference years. The modeling used in the BSR suggested that reducing nitrogen and carbon discharges from WWTPs using "seasonal biological nitrogen removal (BNR) technology" would improve DO compliance by approximately 50 percent, meaning only about 10 percent of Puget Sound would continue to not meet DO standards. CP at 37. The report's authors also found DO noncompliant areas within all of Puget Sound's basins, except Admiralty Inlet. The authors also found "[a]ll areas not meeting the water quality standard have depleted levels of DO in the water column as a result of human loadings from Washington State." CP at 36. While the SSM cannot yet quantify the effects of individual WWTPs, the model confirmed that discharges have both a near- and a far-field effect, meaning that discharges into one part of Puget Sound contribute to DO depletion in other parts of the Sound as the discharged water mixes and travels along the currents.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

## Northwest Environmental Advocates (NWEA) Rulemaking Petition

For years, Ecology has kept stakeholders updated on the development of the SSM and other water quality efforts through the Puget Sound Nutrient Forum. The forum also presented stakeholders with preliminary results from the SSM. Shortly before the official publication of the BSR, NWEA—an active participant in the Nutrient Forum—filed a petition with Ecology "to propose and adopt a rule establishing technology-based effluent limits for the discharge of nutrients and toxics from municipal wastewater treatment facilities that discharge to Puget Sound and its tributaries." AR at 231. Specifically, NWEA wanted a rule designating tertiary treatment of wastewater as "AKART." AR at 231.

AKART stands for "All Known, Available, and Reasonable Treatment." WAC 173-201A-020. AKART represents "the most current methodology that can be reasonably required for preventing, controlling, or abating the pollutants associated with a discharge." *Id.* Under RCW 90.52.040, Ecology is required to adopt rules requiring "wastes to be provided with all known, available, and reasonable methods of treatment prior to their discharge or entry into waters of the state." Such treatment is required regardless of whether the water quality is pristine, impaired, or anywhere in between. RCW 90.52.040. In addition to implementing state law, AKART standards also mirror

11

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

parallel provisions of the Clean Water Act requiring NPDES permittees to adopt the best available technology economically achievable for eliminating the discharge of pollutants. *See* 33 U.S.C. §§ 1311, 1314. Thus, if tertiary treatment meets the definition of AKART, Ecology is obligated by statute to make tertiary treatment a precondition to issuance/reissuance of NPDES permits.

On January 11, 2019, Ecology sent NWEA a concise letter denying the rulemaking petition. Under the APA, Ecology had 60 days to either initiate rulemaking or issue a denial explaining the reasons for denial and "where appropriate" the alternative means Ecology would use to address NWEA's concerns. RCW 34.05.330(1). Ecology denied rulemaking because AKART technologies must be economically feasible and Ecology believed that tertiary treatment was cost prohibitive. While it may be economically feasible for some WWTPs, NWEA's petition wanted tertiary treatment mandated for all 79 Puget Sound WWTPs, regardless of any one plant's size and impact on Puget Sound. Ecology also denied rulemaking because the SSM needed further refinements before Ecology had sufficient data to craft discharger-specific limits for individual NPDES permittees.

Although Ecology denied rulemaking, Ecology shares NWEA's concerns and ultimate goals. It is the policy of this state

12

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

> to maintain the highest possible standards to insure the purity of all waters
> of the state consistent with public health and public enjoyment thereof, the
> propagation and protection of wild life, birds, game, fish and other aquatic
> life, and the industrial development of the state, and to that end require the
> use of all known available and reasonable methods by industries and others
> to prevent and control the pollution of the waters of the state of
> Washington.

RCW 90.48.010. In the denial letter, Ecology announced the alternative actions it would

take:

> Ecology remains committed to [working with stakeholders to solve the DO
> problem in Puget Sound]. While this work is progressing, Ecology *will*
> through the individual permitting process:
> 1.    Set nutrient loading limits at current levels from all permitted
>       dischargers in Puget Sound and its key tributaries to prevent
>       increases in loading that would continue to contribute to Puget
>       Sound's impaired status.
> 2.    Require permittees to initiate planning efforts to evaluate different
>       effluent nutrient reduction targets.
> 3.    For treatment plants that already use a nutrient removal process,
>       require reissued discharge permits to reflect the treatment efficiency
>       of the existing plant by implementing numeric effluent limits used as
>       design parameters in facility specific engineering reports.

CP at 127 (emphasis added). Ecology also stated that it would explore development of a

general permit to regulate "nutrient loading" (i.e., nitrogen discharges) into Puget Sound.

CP at 127. A general permit that covers multiple discharging entities is an alternative to

issuing individual NPDES permits. WAC 173-226-020, -050.

13

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

Unhappy with the denial of its rulemaking petition, NWEA sought judicial review. Division Two of this court affirmed Ecology's denial of the rulemaking petition. *See generally Nw. Env't Advocs. v. Dep't of Ecology*, No. 54810-1-II (Wash. Ct. App. June 22, 2021) (unpublished), http://www/courts.wa.gov/opinions/pdf/548101_unp.pdf).

**NPDES Permits and the Puget Sound Nutrient General Permit**

Ecology started adding new terms to individual NPDES permits as those permits came up for renewal, requiring nitrogen discharge limits and nitrogen reduction planning. Ecology also worked to develop a general permit. The final version of the general permit went into effect January 1, 2022. It placed a limit on how many pounds of nitrogen each large and midsize WWTP could discharge per year and required all WWTPs to create nitrogen reduction plans. Any WWTP that exceeds its annual limit must spend the next year studying what caused it to exceed its limit and what corrective action it can take to not exceed its limit. If a WWTP exceeds its limit two years in a row, it must begin taking that corrective action. The validity of the general permit is currently in litigation at the Pollution Control Hearings Board. That litigation is stayed pending the resolution of this appeal.

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

## Concerns Raised by the Regulated Community

The findings of the BSR, the rulemaking denial letter, and the prospect of a general permit all happened within a fairly short time frame. The commitments made in the denial letter especially alarmed the regulated community.

In the denial letter, Ecology promised that as each NPDES came up for renewal, it would "[s]et nutrient loading limits at current levels . . . to prevent increases in loading that would continue to contribute to Puget Sound's impaired status." CP at 127. The short-term effect of freezing nutrient loading limits impairs development because development increases demand on WWTPs. But, it is not possible to significantly reduce nitrogen in the short term. Significant nitrogen reduction requires long-term capital improvements. Immediately, the city of Tacoma (City) started putting caveats in building permits allowing the City to "rescind the permit" in the event Ecology limited the City's treatment capacity by capping nitrogen discharges. CP at 991. This put several major projects in limbo, including multifamily housing developments, a behavioral health hospital, and an expansion at Bates Technical College Medical School.

An internal legal memo authored by counsel for the City concisely lays out its concerns:

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

> The costs of such full-scale improvements are estimated to range from $250 million to over $750 million and would likely take at least six years or longer to fund, plan for and implement. In the interim, implementation of the TIN [total inorganic nitrogen] load cap would have the unintended consequence of halting development, in effect a de facto moratorium. Projects could not be approved because sewer capacity would not be available. The City will be exposed to substantial risk if it does not qualify all sewer availability notices with the right to rescind the assurance of sewer availability in the event Ecology's permit caps sewer capacity. Adding this condition will impair lending and effectively halt most development, including affordable housing, shelters, and accessory dwelling units. Further, funding of capital improvements needed to meet the new permit requirements has the potential to more than double or triple sewer rates, disproportionately affecting low-income populations.

AR at 620.

There were also concerns that capping nitrogen discharges at current levels, without allowing leeway for development to continue, would unintentionally force growth into rural areas. This would be in areas where septic is allowed due to a lack of sewer service. The unintended consequence of this could make matters worse, causing leaky and untreated septic waste to enter the Puget Sound.

**Petition for Judicial Review**

To prevent Ecology from limiting WWTP discharges, the City and the other respondents filed a joint petition for judicial review under RCW 34.05.570. The City alleged Ecology violated the APA by adopting three "rules" outside of the APA's rulemaking process. Two of the purported rules were in the BSR and the third purported

16

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

rule was in the denial letter. The City refers to the first purported rule as the DO standard rule, the second as the DO impairment rule, and the third as the TIN cap rule.[2]

The City alleged the DO standard rule appeared on page 20 of the BSR, that the DO impairment rule could be found on pages 12, 60, 61, and 62 of the BSR when read together, and that the TIN cap rule could be found in the three commitments Ecology made in the denial letter.

With respect to the DO standard rule, the City alleged the BSR effectively amended WAC 173-201A-210(1)(d)(iii), which covers DO testing and sampling procedures. With respect to the DO impairment rule, the City alleged the BSR effectively amended the state's 303(d) list[3] of impaired water segments when the BSR reported the SSM's findings of areas not meeting Washington's DO water quality standard.

---

[2] The phrase "total inorganic nitrogen" does not appear in the denial letter. The reason the City refers to it as the TIN cap rule is because TIN is the parameter that Ecology settled on for implementing the commitments in its letter.

[3] The 303(d) list is a reference to the list states are required to periodically submit to the Environmental Protection Agency under 33 U.S.C. § 1313(d). Entities that discharge into waterways on the 303(d) list are subject to more stringent requirements in their NPDES permits.

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

With respect to the TIN cap rule, the City alleged that Ecology placed new limits in NPDES permits.

In addition to arguing that the three alleged rules violated RCW 34.05.570 by not going through the rulemaking process, the City also alleged that they were arbitrary and capricious and exceeded Ecology's statutory authority.

The trial court agreed with the City on all grounds and remanded the matter "to Ecology for consideration of the immediate adoption of temporary emergency rules while regular rule-making proceeds." CP at 1483. Ecology appeals.

ANALYSIS

In its briefing to this court, the City abandoned its prior claims that Ecology's purported rules are arbitrary and capricious and exceeded Ecology's statutory authority. Accordingly, the only substantive issue is whether the three purported rules are "rules" as defined by RCW 34.05.010(16) and were therefore required to be adopted through formal rulemaking.

A.     STANDARD OF REVIEW

Whether any of the three purported rules adopted by Ecology are "rules" as defined by Washington's APA are questions of statutory interpretation, the court reviews

18

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

de novo. *Nw. Pulp & Paper Ass'n v. Dep't of Ecology*, 200 Wn.2d 666, 672, 520 P.3d 985 (2022).

Ecology argues that because it is the agency designated to regulate water pollution, we should defer to its interpretation of the laws it administers. *See City of Redmond v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 136 Wn.2d 38, 46, 959 P.2d 1091 (1998) (this court defers to an agency's interpretation of the law it administers). We agree with the legal principle cited by Ecology, but disagree it applies here. We are tasked here with determining the scope of Ecology's *authority* to promulgate purported rules. "'[W]e do not defer to an agency the power to determine the scope of its own authority.'" *Ass'n of Wash. Bus. v. Dep't of Ecology*, 195 Wn.2d 1, 10, 455 P.3d 1126 (2020) (internal quotation marks omitted) (quoting *Lenander v. Dep't of Ret. Sys.*, 186 Wn.2d 393, 409, 377 P.3d 199 (2016)).

B.    THE PURPORTED RULES

The APA defines "rule" as

any agency order, directive, or regulation of general applicability (a) the violation of which subjects a person to a penalty or administrative sanction; (b) which establishes, alters, or revokes any procedure, practice, or requirement relating to agency hearings; (c) which establishes, alters, or revokes any qualification or requirement relating to the enjoyment of benefits or privileges conferred by law; (d) which establishes, alters, or revokes any qualifications or standards for the issuance, suspension, or revocation of licenses to pursue any commercial activity, trade, or

19

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

> profession; or (e) which establishes, alters, or revokes any mandatory
> standards for any product or material which must be met before distribution
> or sale.

RCW 34.05.010(16).

No agency subject to Washington's APA may adopt a rule outside of

the rulemaking process established in chapter 34.05 RCW, §§ .310-.395.

RCW 34.05.570(2)(c). The label that an agency assigns to its activities does not

determine whether those activities constitute rulemaking under the APA. *McGee Guest*

*Home, Inc. v. Dep't of Soc. & Health Servs.*, 142 Wn.2d 316, 322, 12 P.3d 144 (2000).

The APA definition of "rule" implies a two-step inquiry. First, the court

determines whether the purported rule is an "'order, directive, or regulation of general

applicability.'" *Nw. Pulp*, 200 Wn.2d at 672 (quoting RCW 34.05.010(16)). Second, the

court determines whether the purported rule "fall[s] into one of the five enumerated

categories" in RCW 34.05.010(16). *Id*. at 672-73. If the purported rule fails the first part

of the inquiry, "we need not address whether [it] falls within one of the enumerated

categories in satisfaction of the second element." *Id*. at 676.

20

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

For the first inquiry, the City argues that each of Ecology's purported rules are directives of general applicability. For the second inquiry, the City argues that each of the purported rules fit within RCW 34.05.010(16) categories (a) and (c).[4]

1.  *The DO standard described on page 20 of the BSR is not a rule*

This court's first step is to determine whether page 20 of the BSR states a directive of general applicability. The APA does not define "directive" or "general applicability." However, the Supreme Court has previously defined the latter term: "[W]here the challenge is to a policy applicable to all participants in a program, not its implementation under a single contract or assessment of individual benefits, the action is of general applicability within the definition of a rule." *Failor's Pharm. v. Dep't of Soc. & Health*

---

[4] In its first amended petition for judicial review, the City alleged categories (c) and (d), but not (a). Ecology argues that the City's failure to plead RCW 34.05.010(16)(a) in its petition for judicial review precludes consideration of that category. To support its argument, Ecology cites RCW 34.05.546(7). That subsection requires the petitioner to set forth in its petition for review its "reasons for believing that relief should be granted."

RCW 34.05.546(7) does not describe the required level of specificity. On its face, it might require citation only to RCW 34.05.010(16) or it might require citation to one or more of subsection 16's five categories. Because Ecology does not cite any authority to support its argument or attempt to show what level of specificity the legislature intended, we decline to consider the argument. *Holland v. City of Tacoma*, 90 Wn. App. 533, 537-38, 954 P.2d 290 (1998) (passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration).

21

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

*Servs.*, 125 Wn.2d 488, 495, 886 P.2d 147 (1994) (citing *Simpson Tacoma Kraft Co. v.*

*Dep't of Ecology*, 119 Wn.2d 640, 648, 835 P.2d 1030 (1992)).[5]

While the Supreme Court has defined "general applicability," it has not defined the

term "directive" as used in the APA. Undefined terms in statutes are given their ordinary

dictionary definition. *Am. Legion Post No. 32 v. City of Walla Walla*, 116 Wn.2d 1, 8,

802 P.2d 784 (1991). Webster's defines "directive" in its noun form as "something that

serves to direct, guide, and usu. impel toward an action, attainment, or goal." WEBSTER'S

THIRD NEW INTERNATIONAL DICTIONARY 641 (1993).

Applying this definition, page 20 of the BSR does not contain a directive of

general applicability. Page 20 of the BSR states, in relevant part:

> Regions of Puget Sound that do not meet the DO standard are expressed in
> terms of area (e.g., acres or $km^2$). Since the model is three dimensional,
> each vertical column of water is represented by ten layered grid cells. Area,
> in this context, refers to the surface area of the vertical column (which is
> equivalent to the area represented by the grid cell in Figure 4). If DO levels
> in one or more layers in the water column does not meet the DO standard,
> the surface area of that water column is counted towards the total
> noncompliant area.

---

[5] Various cases additionally state, "[a]n action is of general applicability if applied
uniformly to all members of a class." *See, e.g.*, *Failor's Pharm.*, 125 Wn.2d at 495. Trial
courts should not commit the logical fallacy of implying the converse; that is, by implying
that an action is *not* of general applicability if *not* applied uniformly to all members of a
class. Implying this logical fallacy would make it easy for an agency to skirt the
rulemaking requirements of the APA simply by imposing incremental standards on
permittees rather than a single standard.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

CP at 44. Following is a graphic from the BSR depicting the SSM's water column

layering.



CP at 45 (Fig. 4).

This portion of the BSR simply explains how the BSR's authors reported their

results. As defined above, a directive is something that impels toward an action. Because

the DO standard does not impel anyone to act, it is not a "directive" and it therefore is not

a "rule" under the APA.

Yet the BSR report promises to "supply information [to Ecology to] design

management strategies for anthropogenic nutrient inputs affecting DO" and "will be used

to inform and develop the nutrient management strategy for Puget Sound." CP at 45-46.

The City argues that these and other comments within the report show that the BSR

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

approach for measuring DO will be used for determining whether they are in violation of

applicable DO standards.  We are unpersuaded.

The BSR is a tool that Ecology will use to better measure and control DO levels.

There is no indication from the report or elsewhere that Ecology plans to use anything

other than the existing rule, WAC 173-201A-210(1), for measuring DO levels for

deciding whether any WWTP is in violation of its individual permit or a general permit.

Because the first purported rule does not state a "directive," this court does not

address whether it meets either categories (a) or (c) of the second element.

> 2. *The description of DO impairment on pages 12 and 60-62 of the BSR is not a rule*

Page 12 of the BSR states in relevant part:

We found the following when applying [Washington's DO] standards to the
model results:

- The total area of greater Puget Sound waters not meeting the marine
  DO standard was estimated to be around 151,000 acres (612 $km^2$) in
  2006, 132,000 acres (536 $km^2$) in 2008, and 126,000 acres (511 $km^2$)
  in 2014. These areas correspond roughly to about 23%, 20%, and
  19% of greater Puget Sound in each year, respectively, excluding the
  intertidal zone.

- Noncompliant areas are located within all Puget Sound basins except
  Admiralty Inlet.  All areas not meeting the water quality standard
  have depleted levels of DO in the water column as a result of human
  loadings from Washington State.  Model computations take into
  account multiple oceanographic, hydrographic, and climatological

24

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

>           drivers, so that depletions due to human activity alone can be
>           computed by excluding other influences, such as that of the Pacific
>           Ocean.

CP at 36.

The above comments show that the modeling scenarios run using the SSM

projected that every single basin in Puget Sound, except Admiralty, had at least one water

column layer that failed to meet DO standards. As argued by Professors Holtgrieve and

Scheuerell, many of these noncompliant layers might actually be compliant due to

limitations in the SSM's sensitivity. For purposes of the BSR, the report's authors

classified these areas as DO-impaired.

BSR pages 60-62 discuss the SSM's results concerning DO depletion due to

human causes. Page 60 states, in relevant part:

>           The cumulative impact of all human activities causes DO concentrations to
>           decrease by more than 0.2 mg/L at multiple locations in Puget Sound.
>           Figure 25 shows the spatial distribution of minimum water column DO for
>           both existing and reference conditions, along with the difference between
>           the two, for 2006, 2008, and 2014. Spatial patterns in minimum DO under
>           the reference scenario closely resemble the existing condition patterns. The
>           difference plot shows that maximum DO depletions (depletions below the
>           reference condition DO levels) are predicted to occur in inlets where
>           flushing is relatively poor compared to the main channel . . . .

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

CP at 84.

Page 61 (right) is Figure 25, a graphic representation of Puget Sound's DO levels at reference levels without human influence, at existing levels, and the difference between the two, as predicted by the SSM.

Page 62 reiterates the findings summarized in the abstract from page 12,



Figure 25. Comparison of the spatial distribution of predicted 2006, 2008, and 2014 minimum dissolved oxygen (DO) concentrations, corresponding reference condition scenarios, and the difference between them.
Areas that are green to blue are most sensitive to DO depletion from all human sources in Washington.

but with more detail on duration and degree of DO noncompliance.

The City argued that when read together, the pages conclude "that all municipal WWTPs discharging to Puget Sound are causing or contributing to the alleged impairment, effectively expanding the existing list of 'impaired' or CWA 303(d) water bodies in Washington to include all of Puget Sound." CP at 1204.

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

During oral argument, the City withdrew this assignment of error.[6] We accept this concession. Similar to our conclusion in the previous section, BSR pages 12, 60, 61, and 62 do not state a directive. That is, they do not impel one to act. Rather, these pages state the authors' conclusions.

3. *Ecology's commitments in the denial letter and subsequent actions show it has adopted rules in violation of the APA*

In the abstract, it is difficult to discern whether Ecology's commitments to NWEA in the denial letter constitute a rule under the APA. It therefore is necessary to consider how Ecology has implemented its commitments.

We previously outlined how Ecology began implementing some of its commitments through the issuance of renewed individual permits while in the process of formulating a general permit. We now provide greater detail on this process.

*The new general permit*

Beginning in April 2018, Ecology convened meetings of the Puget Sound Nutrient Forum for the purpose of developing a nutrient reduction plan for Puget Sound. At the first meeting, Ecology outlined to stakeholders some options to address nutrient sources

---

[6] Wash. Court of Appeals oral argument, *City of Tacoma v. Dep't of Ecology*, No. 39494-8-III (June 7, 2023), at 40 min., 40 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-3-court-of-appeals-2023061095/?eventID=2023061095.

27

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

and some nutrient reduction strategies being used in other parts of the country. At the March 2019 meeting, representatives from around the country discussed their use of general permits to regulate nutrient pollution in their respective areas. Following these presentations, stakeholders expressed interest in a general permit that would address Puget Sound nutrient pollution. Pursuant to WAC 173-226-060, in August 2019, Ecology issued a preliminary determination to develop a general permit, and provided a 60-day comment period.

Ecology convened a Puget Sound Nutrient General Permit advisory committee to advise it in drafting permit requirements to reduce nutrient loads discharged into Puget Sound by WWTPs. The advisory committee represented diverse stakeholders, including WWTPs, environmental organizations, and state and federal agencies. The City was a member of the committee.

After several monthly meetings, Ecology developed a preliminary draft general permit and solicited public comment from January 27, 2021 through March 15, 2021. Ecology used the comments it received to develop a formal draft general permit, which it released for another round of public comment on June 16, 2021. Ecology issued the general permit on December 1, 2021.

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

The general permit categorizes permittees as dominant, moderate, or small—based on the amount of TIN they annually discharge into Puget Sound. Dominant and moderate loaders have TIN action levels that Ecology calculated to reflect the pounds of TIN each facility discharges each year. Dominant and moderate loaders are required to implement a nutrient optimization plan to maximize nitrogen removal by their existing treatment facility and submit a nutrient reduction evaluation to Ecology by December 31, 2025.

If a dominant loader exceeds its action level, it must submit a report with a proposed approach to reduce its annual TIN load by 10 percent but it does not need to implement the proposed approach unless it exceeds its action level two years in a row or three years during the five-year permit term.

If a moderate loader exceeds its action level, it must submit a report with a proposed approach to reduce its annual TIN load below its action level but does not need to implement the proposed approach unless it exceeds its action level two years in a row or three years during the five-year permit term.

Small loaders do not have any caps on nutrient discharges but must implement a nutrient optimization plan to maximize nitrogen removal by their existing treatment facility and submit an AKART analysis to Ecology by December 31, 2025.

29

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

The impact of these changes goes further than requiring the WWTPs to comply with existing water quality standards. As noted previously, these changes actually freeze existing nutrient loading limits because the action level is based on each permittee's prior year TIN load rather than existing water quality standards.

*Renewal of individual permits*

While Ecology was in the process of formulating the general permit, it imposed restrictions similar to those described in the individual permits for Birch Bay and the Big Lake WWTPs. Those individual permits became effective March 1, 2021, and do not expire until 2026.

*The practical effect of the denial letter creates rules*

Ecology argues that the denial letter cannot be a rule within the meaning of the APA because it does not direct, order, or require anything. We disagree. As explained below, it directs its own staff to impose new restrictions within NPDES permits.

<u>*First inquiry*</u>: *Directive of general applicability*

The first inquiry is whether the purported rule is an order, directive, or regulation of general applicability. *Nw. Pulp*, 200 Wn.2d at 672. "[W]here the challenge is to a policy applicable to all participants in a program, not its implementation under a single contract or assessment of individual benefits, the action is of general applicability within

30

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

the definition of a rule." *Failor's Pharm.*, 125 Wn.2d at 495 (citing *Simpson*, 119 Wn.2d at 648). Here, Ecology's commitments in the denial letter are of general applicability because they apply to all WWTPs.

The parties, however, dispute whether the action is a "directive." As previously defined, a directive is something that impels action. The precise issue presented in this appeal is whether a directive can be an internal directive, e.g., a commitment by Ecology that its own staff will impose new requirements on permittees.

Ecology argues that including an internal directive within the APA definition of directive is inconsistent with *Sudar v. Department of Fish and Wildlife Commission*, 187 Wn. App. 22, 31-33, 347 P.3d 1090 (2015). We question some of the broad language used by the *Sudar* court.

We begin first by discussing *Simpson*. In *Simpson*, Ecology determined that the state's existing water quality standard required all NPDES permits issued to pulp and paper mills to limit dioxin discharges to no more than 0.13 parts per quadrillion because that was the level at which dioxin "'may . . . adversely affect public health.'" 119 Wn.2d at 643. "Ecology arrived at this numeric standard by using federal guidance and federal data, but without going through rule-making procedures." *Id*. at 643-44. Ecology's staff included the new standard in all pulp and paper mills' NPDES permits. *Id.* at 644.

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

The pulp and paper mills sued. They argued that this new numeric standard that Ecology's staff required in all renewed permits needed to be adopted through the rulemaking process. The Supreme Court agreed. It noted that the nature of a rule is "'it [must] apply to individuals only as members of a class.'" *Id.* at 648 (quoting William R. Andersen, *The 1988 Washington Administrative Procedure Act—An Introduction*, 64 WASH. L. REV. 781, 790 (1989)). The high court concluded that the numeric standard was a directive of general applicability because it applied "uniformly to the entire class of entities which discharges dioxin into the state's waters . . . ." *Id.* It also concluded that the violation would subject the respondents to punishment if they did not comply with the new standard. *Id.* at 647. Because the two inquiries for what constitute a rule were satisfied, the court concluded that the rule was invalid because Ecology failed to satisfy the APA requirements for rulemaking. *Id.* at 648-49. *Simpson* stands for the proposition that "directive" includes an agency's internal directive to its staff for issuing permits.

In *Sudar*, the Fish and Wildlife Commission adopted Policy C-3620. The policy set "guiding principles and a series of actions it may follow to improve the management of salmon in the Columbia River Basin." 187 Wn. App. at 27. The policy "outline[d] a number of objectives, including phasing out the use of nonselective gill nets in nontribal commercial fisheries . . . and the transition of gill net use to off-channel areas." *Id.* The

32

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

*Sudar* court held that the policy was not a rule under the APA and distinguished *Simpson* on the basis that the policy was "unenforceable until and unless the Department promulgates rules that can be enforced on violators." *Id.* at 32. This is not an apt distinction. In *Simpson*, the directive to the agency employees was not a promulgated rule. Rather, the agency's employees were directed to include a new standard in all renewed permits and, by doing so, the permitees were subject to punishment if they violated the new standard.

Ecology argues that construing directive as including an internal directive is inconsistent with *Northwest Pulp*. We conclude that the language relied on by Ecology is nonbinding dicta.

In *Northwest Pulp*, our Supreme Court reviewed a challenge to Ecology's adoption, in its manual, of two new methods for identifying the source of polychlorinated biphenyls (PCBs) in water, Methods 1668C and 8082A. 200 Wn.2d at 670. There, permit writers were required to use Method 608.3 to determine compliance with PCB limits but had discretion whether to use data collected by Methods 1668C and 8082A when evaluating the source of PCBs. *Id.* at 670-71. There, the court agreed with the lower appellate court's distillation of what characterizes a rule of general applicability: an agency action is not a rule when it "'(1) allows staff to exercise

33

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

discretion, (2) provides for case-by-case analysis of variables rather than uniform application of a standard, and (3) is not binding on the regulated community . . . .'" *Id.* at 673 (quoting *Nw. Pulp & Paper Ass'n v. Dep't of Ecology*, 20 Wn. App. 2d 533, 500 P.3d 231 (2021), *aff'd*, 200 Wn.2d 666). Applying those standards, the court concluded that the challenged methods were not rules because permit writers had discretion to choose the best method for measuring PCB sources on a case-by-case basis. *Id.* at 674.

Admittedly, later in the opinion, the court noted that Ecology's internal manual had no independent regulatory effect. *Id.* at 676. This is the comment Ecology relies on for implying that only regulations can be a rule. We disagree for two reasons. First, there is no functional difference between a promulgated rule that adds new terms for renewing a permit and a directive to staff to add new terms for reissuing a permit. Second, the *Northwest Pulp* court's comment was surplusage and, taken literally, would have overruled *Simpson*. It is well established that statements in a case that do not relate to an issue before the court and are unnecessary to decide the case constitute obiter dictum and need not be followed. *Malted Mousse, Inc. v. Steinmetz*, 150 Wn.2d 518, 531, 79 P.3d 1154 (2003). If the court's passing comment was intended to change precedent, agencies could adopt rules internally without the rulemaking process simply by directing staff to

34

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

include the new rules in every renewed permit. This would render the APA's requirement

for rulemaking meaningless.

Here, unlike *Northwest Pulp*, Ecology directed its staff to include new

requirements in both the individual permits and the general permit. The record indicates

these requirements were nondiscretionary and were part and parcel of the commitments

Ecology made to NWEA.

> *Second inquiry: The action establishes, alters, or revokes any*
> *qualification or requirement relating to the enjoyment of benefits or*
> *privileges conferred by law*

To prove that the denial letter established a "rule" under RCW 34.05.010(16)(c),

the City relies heavily on *Failor's Pharmacy* and *Hillis v. Department of Ecology*,

131 Wn.2d 373, 932 P.2d 139 (1997).

In *Failor's Pharmacy*, the Department of Social and Health Services (DSHS)

issued policy memoranda changing the way DSHS calculated Medicaid pharmacy

reimbursement rates. 125 Wn.2d at 491-92.[7] The policy memoranda established

---

[7] *Failor's Pharmacy* was decided under a prior version of the APA when it was codified under chapter 34.04 RCW; however, the definition of "rule" and its five categories were the same then as today.

35

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

reimbursement tiers based on a pharmacy's business volume. *Id.* After several years

operating under these new rate calculations, multiple pharmacies sued. *Id.* at 492.[8]

The pharmacies argued that the policy memoranda instituted invalid rules

because they were orders/directives/regulations of general applicability that established,

altered, or revoked a qualification or requirement relating to the enjoyment of benefits or

privileges conferred by law. *Id.* at 494. DSHS responded that the policy memoranda

did not "'relat[e] to the enjoyment of benefits or privileges conferred by law'" under

former RCW 34.04.010(2)(c) (1988) because pharmacies have "neither statutory nor

contractual rights to payment until performance and can withdraw from the program at

any time . . . ." *Id.* at 496. DSHS additionally responded that Medicaid participation was

voluntary and the pharmacies were free to accept or reject Medicaid clients. *Id.*

The Supreme Court disagreed with DSHS by focusing on Medicaid patients.

While federal case law suggested that Medicaid participation was not a benefit or a

privilege conferred by law to Medicaid providers, Medicaid was a benefit conferred to

Medicaid patients. *Id.* at 496-97. In holding that the policy memoranda instituted invalid

---

[8] Similar to this case, the pharmacies were affected by the agency's policy memorandum only indirectly, by the agency requiring its staff to include the new terms in its Medicaid reimbursement contracts. An additional similarity is the presence of a tiered system based on volume rather than a uniform requirement.

36

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

rules, the court stated:

> [T]he inclusion of the reimbursement schedules in a unilateral contract does not preclude their status as a rule. . . . The benefit of the Medicaid program runs to the Medicaid patient, RCW 74.09.200, and its enjoyment is altered by the change in reimbursement rates. By insulating reimbursement schedule changes from rulemaking requirements Defendant denied notice and comment to those intended beneficiaries of the program.

*Id.* at 497 (citations omitted).

*Failor's Pharmacy* directly supports the City's argument. The challenged portion of the denial letter promised that Ecology's permit writers would alter the qualifications and requirements for NPDES permits. A letter mandating that new performative language be included in all NPDES permits is indistinguishable from the memoranda in *Failor's Pharmacy* mandating new price terms in Medicaid reimbursement contracts. Furthermore, issuance of an NPDES permit is a privilege conferred by law because without an NPDES permit, no person or entity may discharge any substance into Puget Sound. RCW 90.48.160, .162.

Ecology attempts to distinguish *Failor's Pharmacy* by arguing that the new requirements in the permits are mandated by WAC 173-201A-510, which prohibits WWTPs from violating existing water quality standards. We disagree that the new permit requirements merely require the WWTPs to comply with existing water quality standards. Existing water quality standards set numeric levels for DO in Puget Sound but do not

37

No. 39494-8-III
*City of Tacoma v. Dep't of Ecology*

regulate or set numeric levels for nitrogen discharges. While nitrogen is one of several causes of DO impairment, it has never been subject to direct regulation until now.

We conclude that the City has satisfied both parts of the two-part inquiry and that the commitments in the denial letter are "rules," as defined by the APA. We further conclude that the new requirements in the individual permits and the general permit are unlawful. If Ecology desires to keep its commitments to NWEA, it must do so through the rulemaking procedures of the APA.

Affirm in part; reverse in part.[9]

_____
Lawrence-Berrey, J.

WE CONCUR:

_____
Fearing, C.J.

_____
Pennell, J.

---

[9] Amici raise the question of whether the City had standing to file suit in superior court. Ecology did not raise standing as an issue before this court. We generally decline to address issues raised solely by amici. *State v. J.W.M.*, 1 Wn.3d 58, 74 n.4, 524 P.3d 596 (2023); *State v. Hirschfelder*, 170 Wn.2d 536, 552, 242 P.3d 876 (2010); *Teamsters Local 839 v. Benton County*, 15 Wn. App. 2d 335, 352, 475 P.3d 984 (2020). For this reason, we decline to address the issue of standing.