FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
SEPTEMBER 5, 2024

_González, C.J._
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
SEPTEMBER 5, 2024

SARAH R. PENDLETON
ACTING SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| CITY OF TACOMA, BIRCH BAY WATER AND SEWER DISTRICT, KITSAP COUNTY, SOUTWEST SUBURBAN SEWER DISTRICT, and ALDERWOOD WATER & WASTEWATER DISTRICT, Municipal Corporations and Political Subdivisions of the State of Washington, | No. 102479-7 |
| | En Banc |
| Respondents, | |
| v. | Filed: September 5, 2024 |
| STATE OF WASHINGTON, DEPARTMENT OF ECOLOGY, | |
| Petitioner. | |

WHITENER, J.— Puget Sound is polluted, and the pollutant in question is nitrogen. Even though nitrogen is a nutrient, too much nitrogen can have disastrous consequences for marine life. After a study was done on nutrient pollution in Puget Sound, Washington State Department of Ecology (Ecology) concluded that the most likely sources of human produced nitrogen are wastewater treatment plants. Under federal and state laws, wastewater treatment plants may not discharge pollutants into waters without a permit from Ecology. The Northwest Environmental Advocates (NWEA) petitioned Ecology to include nitrogen discharge limits in their regulations.

1

Ecology denied NWEA's petition, and in the denial letter, Ecology made a commitment to NWEA that it "will, through the individual permitting process … [s]et nutrient loading limits at current levels from all permitted dischargers in Puget Sound…." Clerk's Papers (CP) at 127. Subsequently, Ecology issued permits to wastewater treatment plants that capped nitrogen discharges at varying levels.

At issue in this case is whether the commitment Ecology made to NWEA is a "rule" for purposes of the Administrative Procedure Act (APA) as defined by RCW 34.05.010(16). If it is a "rule," the respondents ask that we declare the "rule" invalid because it "was adopted without compliance with statutory rule-making procedures." RCW 34.05.570(2)(c). The respondents are a grouping of municipalities and special purpose districts that operate wastewater treatment plants that discharge into Puget Sound. They jointly petitioned the superior court for judicial review of the commitment in the denial letter. The superior court and Court of Appeals both held that Ecology's commitment in the denial letter amounted to a "rule" under the APA. Both courts found it was adopted without statutory rule-making procedures and both courts invalidated it.

One of two necessary conditions of a "rule" is that the agency action is a directive of "general applicability." RCW 34.05.010(16). We conclude that Ecology's actions following the denial letter show that the commitment in the denial

2

letter is not a directive of "general applicability," and therefore it is not a "rule" for the purposes of the APA. Accordingly, we reverse the Court of Appeals and remand to the superior court for any further proceedings that may be necessary.

## FACTUAL AND PROCEDURAL HISTORY

Although nitrogen is a naturally occurring nutrient, it is also a pollutant, as too much of it in our waters starts a cascading event called eutrophication that is destructive for aquatic life. Eutrophication is when too much nitrogen helps grow too much algae, then too much algae creates too much carbon, and ultimately too much carbon depletes the water of too much oxygen. Oxygen is necessary for marine life to thrive, and its depletion has disastrous consequences for aquatic ecosystems.

To identify possible sources of human introduced nitrogen in Puget Sound, Ecology used a "peer-reviewed, state-of-the-science computer modeling tool" called the Salish Sea[1] Model (SSM). CP at 33. In January 2019, Ecology published a report called the Bounding Scenarios Report (BSR). The report contained Ecology's findings from the SSM. The report's authors found that 20 percent of Puget Sound "does not meet [Washington State's] dissolved oxygen standards." CP at 35, 108.

---

[1] Puget Sound is the southern portion of a greater body of water called the Salish Sea, which spans from southwest British Columbia, Canada to northwest Washington State. In addition to Puget Sound, the Salish Sea includes the Strait of Georgia and the Strait of Juan de Fuca.

The report concluded that the most likely sources of human produced nitrogen in Puget Sound are wastewater treatment plants. The report covered only the 79 municipal wastewater treatment plants that discharge directly into the Washington portion of the Salish Sea.

Wastewater treatment plants treat water in stages: primary, secondary, and tertiary treatment. U.S. ENVT'L PROT. AGENCY, HOW WASTEWATER TREATMENT WORKS ... THE BASICS (EPA 833-F-98-002) (May 1998), https://www3.epa.gov/npdes/pubs/bastre.pdf [https://perma.cc/4K46-3REV]. Primary treatment consists of removing large solids by capturing them through a series of screens or letting them sink and capturing them with the help of gravity. *Id*. Secondary treatment involves removing the majority of organic matter from the wastewater through techniques such as the trickling filter and the activated sludge process. *Id*. Tertiary treatment can include the disinfection of pathogenic microorganisms and viruses but also, most important for this case, the removal of nutrients such as nitrogen. COMM. ON USE OF TREATED MUN. WASTEWATER EFFLUENTS & SLUDGE IN PROD. OF CROPS FOR HUM. CONSUMPTION, NAT'L RES. COUNCIL, USE OF RECLAIMED WATER AND SLUDGE IN FOOD CROP PRODUCTION (1996). Not all wastewater treatment plants engage in tertiary treatment.

With the passage of the Federal Water Pollution Control Act of 1972 (Clean Water Act), Congress sought to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Clear Water Act created the "National Pollutant Discharge Elimination System (NPDES)," making it unlawful to discharge pollutants without an NPDES permit. *See* 33 U.S.C. § 1342. The issuance of NPDES permits is delegated to the states. 33 U.S.C. § 1342(b). Ecology is designated as the "state water pollution control agency for all purposes of the federal clean water act." RCW 90.48.260, .520. With the exception of federally owned facilities and tribal lands, which remain under the purview of the federal Environmental Protection Agency (EPA), Ecology has been delegated authority to issue NPDES permits in Washington State. *Washington NPDES Permits*, U.S. ENVT'L PROT. AGENCY, https://www.epa.gov/npdes-permits/washington-npdes-permits [https://perma.cc/BX4M-ZQ7Z]. When issuing an NPDES permit, Ecology must ensure that "all wastes … proposed for entry into said waters shall be provided with *all known, available, and reasonable methods of treatment* prior to entry." RCW 90.54.020(3)(b) (emphasis added). This requirement is also known as AKART. WAC 173-201A-020. Ecology must also consider the permit "applicant's operations" when making permit conditions. RCW 90.48.520.

On November 18, 2018, NWEA petitioned Ecology to require tertiary treatment, including the removal of nutrients such as nitrogen, in Ecology's calculation of what constitutes AKART. CP at 126. Under the APA, the agency must respond to a rule petition within 60 days with a denial or initiation of rule-making proceedings. RCW 34.05.330(1). If the petition is denied, the agency must state the reasons for the denial and "where appropriate … the alternative means by which it will address the concerns raised by the petitioner." RCW 34.05.330(1)(a)(ii). Within 60 days, Ecology sent NWEA a letter denying their petition. Justifying its denial, Ecology wrote,

> Treatment technology must be both economically and technically feasible in order to be AKART. Currently, the Environmental Agency is conducting a nationwide Public[]ly Owned Treatment Works (POTW) nutrient survey, in part because enhanced treatment for nutrient removal is neither affordable nor necessary for all wastewater treatment plants.

CP at 127. Ecology then gave several alternative means by which it would address NWEA's concerns about "increased nutrient loading," including a commitment that

> Ecology will, through the individual permitting process:
>
> 1. Set nutrient loading limits at current levels from all permitted dischargers in Puget Sound and its key tributaries to prevent increases in loading that would continue to contribute to Puget Sound's impaired status.

6

*Id.* NWEA appealed their petition's denial, which was affirmed by both the superior court and the Court of Appeals.[2]

As NPDES permits for wastewater treatment plants came up for renewal after the denial letter, Ecology began to include nitrogen discharge limits and requirements for nitrogen reduction plans in some permits. For Birch Bay Water and Sewer District (Birch Bay), three years of nitrogen monitoring data was considered when it was given an annual discharging limit of 74,900 pounds of nitrogen in its permit. For Big Lake Wastewater Treatment Plant (Big Lake), a 2014 upgrade from a rotating biological contactor to a membrane bioreactor, allowing for the removal of nitrogen, was considered when it was given an annual discharging limit of 10,658 pounds of nitrogen in its permit. Ecology also created a general permit that sorted 58 wastewater treatment plants into three tiers, "dominant," "moderate," and "small," based on the amount of nitrogen they annually discharged. Only 27 wastewater treatment plants, those placed in the "dominant" and "moderate" tiers, had annual nitrogen discharge limits placed on them.

---

[2] Before the second division of the Court of Appeals, NWEA argued that because tertiary treatment is now more easily available, Ecology's refusal to include tertiary treatment within its regulatory definition of AKART violates Ecology's statutory duties. *Nw. Env't Advocs. v. Dep't of Ecology*, No. 54810-1-II, slip op. at 12 (Wash. Ct. App. June 22, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2054810-1-II%20Unpublished%20Opinion.pdf. The appellate court agreed with Ecology and held that state law concerning AKART does not require Ecology to revisit its regulations when new treatments are reasonably available, state law concerning AKART simply requires Ecology to make a case-by-case determination of what is reasonable for each permit applicant when issuing their permit. *Id.* at 12-14.

The commitment in the denial letter concerned municipalities because the population growth and the corresponding growth in development would necessitate more wastewater treatment, which would ultimately lead to more nitrogen discharging into Puget Sound. In response to the commitment in the denial letter, the city of Tacoma began putting clauses into new building permits giving the city the right to rescind building permits "in the event that the Department of Ecology limits or restricts the City's then-currently available wastewater treatment capacity through a total inorganic nitrogen load cap … and the City determines that, as a result of these new requirements, capacity is not available for this project." CP at 991.

The city of Tacoma, Birch Bay Water & Sewer District, Kitsap County, Southwest Suburban Sewer District, and Alderwood Water & Wastewater District (Respondents) filed a petition for judicial review and declaratory judgment in Thurston County Superior Court. Respondents alleged that Ecology unlawfully promulgated rules in violation of the APA with the denial letter and in portions of the BSR. The superior court agreed with the Respondents and held that Ecology adopted these rules in "violation of the procedural requirements for rulemaking under the [APA]" and that "Ecology may not use annual TIN [total inorganic nitrogen] loading limits on all municipal wastewater treatment plants discharging to

8

Puget Sound in reviewing and conditioning general or individual … permits without complying with statutory rulemaking procedures." CP at 1482-83.

Ecology appealed the superior court's decision. Division Three of the Court of Appeals reversed the superior court in part and affirmed it in part. *City of Tacoma v. Dep't of Ecology*, 28 Wn. App. 2d 221, 251, 535 P.3d 462 (2023). Reversing the superior court, the Court of Appeals held that the challenged portions of the BSR did not establish a "rule" under the APA, as they were not a "directive," nor did it "impel one to act"; rather, they were simply explanations as to how the report's "authors reported their results" and "conclusions" of their study. *Id.* at 238-39, 243. However, affirming the superior court, the Court of Appeals held that "Ecology's commitments in the denial letter and subsequent actions show it has adopted rules in violation of the APA." *Id.* at 243 (italics omitted). The appellate court further concluded that the individual permits for Birch Bay and Big Lake, as well as the general permit[3] were unlawful as they relied on the commitment in the denial letter. *Id.* at 251.

Ecology appealed the Court of Appeals' decision. At issue here is whether Ecology's commitment in its denial letter to NWEA to cap "nutrient loading limits

---

[3] The appellate court made this finding about the general permit despite it being in a pending action before the Pollution Control Hearings Board.

at current levels" for "all permitted dischargers" "through the individual permitting process" established a "rule" under the APA as defined by RCW 34.05.010(16). CP at 127.

ANALYSIS

The agency action that the Respondents argue is a "rule" as defined by RCW 34.05.010(16) is this portion of the denial letter:

> Ecology will, through the individual permitting process …
>
> … [s]et nutrient loading limits at current levels from all permitted dischargers in Puget Sound and its key tributaries to prevent increases in loading that would continue to contribute to Puget Sound's impaired status.

CP at 127. Whether an agency action is a "rule" under the APA as defined by RCW 34.05.010(16) is a question of statutory interpretation, which this court reviews de novo. *Nw. Pulp & Paper Ass'n v. Dep't of Ecology*, 200 Wn.2d 666, 672, 520 P.3d 985 (2022) (citing *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002)). "Rules" are invalid unless adopted in compliance with the APA's rule making procedures. *Id.*; RCW 34.05.570(2)(c). Those procedures include providing the public with notice of the proposed rule and an opportunity to comment on the proposed rule. *Nw. Pulp & Paper Ass'n*, 200 Wn.2d at 672; RCW 34.05.320, .325. RCW 34.05.010(16) defines a "rule" as

any agency order, directive, or regulation of general applicability (a) the violation of which subjects a person to a penalty or administrative sanction; (b) which establishes, alters, or revokes any procedure, practice, or requirement relating to agency hearings; (c) which establishes, alters, or revokes any qualification or requirement relating to the enjoyment of benefits or privileges conferred by law; (d) which establishes, alters, or revokes any qualifications or standards for the issuance, suspension, or revocation of licenses to pursue any commercial activity, trade, or profession; or (e) which establishes, alters, or revokes any mandatory standards for any product or material which must be met before distribution or sale.

Accordingly, whether an agency action is a "rule" under the APA requires establishing two elements or necessary conditions. *Nw. Pulp & Paper Ass'n*, 200 Wn.2d at 672. First, the agency action must be an "'order, directive, or regulation of general applicability.'" *Id.* (quoting RCW 34.05.010(16)). Second, the agency action must fall within at least one of the five enumerated categories listed in RCW 34.05.010(16)(a)-(e). *Id.* at 672-73. Ecology argues that the commitment in the denial letter is not a "rule" as defined by RCW 34.05.010(16) because it does not satisfy either of the two necessary conditions. Respondents argue that the commitment in the denial letter is a "rule" as defined by RCW 34.05.010(16) because it is a "directive … of general applicability" and it fits within two of the five enumerated categories, specifically RCW 34.05.010(16)(a) and (c).

Whether an agency action constitutes an "order, directive, or regulation of general applicability," the first necessary condition of a "rule" under RCW

11

34.05.010(16) turns on whether the agency action (1) allows staff to exercise discretion, (2) provides for case-by-case analysis of variables rather than uniform application of a standard, and (3) is not binding on those regulated. *Nw. Pulp & Paper Ass'n*, 200 Wn.2d at 673. If this is so, then the agency action is not an "order, directive, or regulation of general applicability." *Id*.

The appellate court found that Ecology's statements in the denial letter were commitments to NWEA, and Ecology's subsequent actions, specifically the two individual permits and general permit, did not allow staff to exercise discretion or provide for a case-by-case analysis. *City of Tacoma*, 28 Wn. App. 2d at 248. "Ecology directed its staff to include new requirements in both the individual permits and the general permit. The record indicates these requirements were nondiscretionary and were part and parcel of the commitments Ecology made to NWEA." *Id*.

The heart of the disagreement between the parties and the lower courts is how the instant case relates to our holdings in three different cases: *Simpson Tacoma Kraft Co. v. Department of Ecology*, 119 Wn.2d 640, 835 P.2d 1030 (1992), *Failor's Pharmacy v. Department of Social and Health Services*, 125 Wn.2d 488, 886 P.2d 147 (1994), and *Northwest Pulp and Paper Ass'n*, 200 Wn.2d 666.

In *Simpson Tacoma Kraft Co.*, the EPA had determined that pulp and paper mills were discharging dioxin into the water. 119 Wn.2d at 643. Ecology created an internal policy in response to the EPA's finding, requiring staff to include a uniform formulation of a numeric water quality standard in all NPDES permits. *Id*. at 644. Ecology employees gave deposition testimony that they were bound to apply that formula in all permits. *Id*. The pulp and paper mills challenged Ecology's internal policy, arguing that it was an unlawful "rule" that was promulgated without following necessary rule-making procedures under the APA. *Id.* at 642. We agreed and held that the agency action of Ecology's internal policy requiring staff to place the formula in individual permits, uniformly, constituted a directive of "general applicability." *Id.* at 648.

Similar to *Simpson Tacoma Kraft Co.*'s concerns about Ecology, a state agency executing a federal program under the Clean Water Act, *Failor's Pharmacy* concerned another state agency, the Department of Social and Health Services (DSHS), executing another federal program, Medicaid. 125 Wn.2d at 491. DSHS was to provide pharmacies reimbursements for services rendered under Medicaid. *Id.* The methodology for reimbursement described in the WAC followed federal mandates and was based on the cost of drug ingredients and a dispensing fee. *Id.* Later, DSHS created an internal policy that changed the reimbursement rates for

pharmacies into a three-tiered system sorted by the number of prescriptions pharmacies dispensed per year: 35,000 prescriptions or more a year, 15,000 to 35,000 per year, and fewer than 15,000 per year. *Id*. at 492. We found that the agency action of DSHS's new internal policy changing the reimbursement rates were "uniformly applied to all members of the class of Medicaid prescription providers" and "constitute[d] additions to and refinements of reimbursement methodology, not mere applications of existing regulations," and we held that it was a directive of "general applicability." *Id.* at 495-96.

In *Northwest Pulp and Paper Ass'n*, Ecology was concerned about the polychlorinated biphenyls (PCBs) being discharged into the water. 200 Wn.2d at 668. Ecology revised its staff manual in order to provide guidance to staff tasked with drafting NPDES permits as to the number of methods they could use in measuring the number of PCBs discharged. *Id*. Northwest Pulp and Paper Association challenged the revision to the staff manual, arguing that Ecology promulgated a "rule" without complying with the APA rule-making process. *Id*. at 671. We held that the revision to the manual did not amount to a directive of "general applicability" as it did not impose a uniform standard; it simply gave permit writers "the discretion to choose the type of monitoring necessary based on the circumstances of the facility." *Id.* at 674.

14

Unlike the internal policy of Ecology in *Simpson Tacoma Kraft Co.* and the internal policy of DSHS in *Failor's Pharmacy*, Ecology's commitment in the denial letter is not a directive of "general applicability." The recipients for the internal policies in *Simpson Tacoma Kraft Co.* and *Failor's Pharmacy* were agency staff, and the policies bound them to certain actions, removed their discretion, required uniform application, and made the internal policy binding on those regulated. The recipient for the commitment in the denial letter was NWEA, and the difference between what Ecology *committed to doing* in the denial letter with permitting and what Ecology *actually did* with permitting shows that the commitment in the denial letter did not bind Ecology staff. Ecology staff retained their discretion, employed case-by-case analysis of the wastewater treatment plants' operations, and the denial letter was ultimately not binding on those regulated.

The individual permits and the general permit did not "[s]et nutrient loading limits at current levels from all permitted dischargers in Puget Sound" as Ecology committed to doing. CP at 127. Instead, Ecology staff had discretion and did a case-by-case analysis of the permit holder's operations when considering whether to impose annual nitrogen discharge limits at all and, if so, what the limits would be. When issuing the new permit for Birch Bay, three years of nitrogen monitoring data was considered when it was given an annual discharging limit of 74,900 pounds of

15

nitrogen. When issuing the new permit for Big Lake, a 2014 upgrade from a rotating biological contactor to a membrane bioreactor, allowing for the removal of nitrogen, was considered when it was given an annual discharging limit of 10,658 pounds of nitrogen. Ecology also created a general permit that sorted 58 wastewater treatment plants into three tiers, "dominant," "moderate," and "small," based on the amount of nitrogen they annually discharged. Less than half of the wastewater treatment plants had annual nitrogen discharge limits placed on them, only the 27 wastewater treatment plants placed in the "dominant" and "moderate" tiers. Given the variability of whether limits were imposed at all and how limits were calculated when they were imposed, it is clear that Ecology did not bind its staff to "[s]et[ting] nutrient loading limits at current levels from all permitted dischargers in Puget Sound" "through the individual permitting process," as it committed to doing so in the denial letter to NWEA. *Id.*

Whether an agency action is a "rule" under the APA requires establishing two elements or necessary conditions. *Nw. Pulp & Paper Ass'n*, 200 Wn.2d at 672-73. First, the agency action must be an "order, directive, or regulation of general applicability." *Id*. at 672. Second, the agency action must fall within one of the five enumerated categories listed in RCW 34.05.010(16)(a)-(e). *Id*. at 672-73. One of the two necessary conditions of a "rule" as defined by RCW 34.05.010(16) is not met

16

because the commitment in the denial letter is not a directive of "general applicability." Therefore, the inquiry as to whether the commitment in the denial letter is a "rule" under the APA stops here. Accordingly, we reverse the Court of Appeals, as the commitment in the denial letter is not a "rule" as defined by RCW 34.05.010(16).

## CONCLUSION

The commitment in the denial letter is not a directive of "general applicability" as it did not eliminate staff discretion or prevent a case-by-case analysis of the permit holder's operations when issuing permits. Being a directive of "general applicability" is one of the two necessary conditions of a rule as defined under RCW 34.05.010(16). Therefore, the commitment in the denial letter is not a "rule." Accordingly, we reverse the Court of Appeals and remand to the superior court for any further proceedings that may be necessary.

Whitener, J.

WE CONCUR.

González, C.J.

Stephens, J.

Johnson, J.

Gordon McCloud, J.

Madsen, J.

Yu, J.

Owens, J.

Montoya-Lewis, J.